[S. F. No. 6042. Department One.—March 9, 1914.]

VICTORIA STEAMSHIP COMPANY (a Corporation), Appellant, v. WESTERN ASSURANCE COMPANY OF TORONTO (a Corporation), Respondent.

MARINE INSURANCE — FREIGHTAGE — INSURANCE WHILE SHIP IS BEING LOADED.—Under section 2662 of the Civil Code the owner of a ship has an insurable interest in the "freightage" while the ship is being loaded. His insurable interest is not postponed until the loading of the cargo is complete.

ID.—CARGO POLICY—INSURANCE ATTACHING TO CARGO AS FAST AS LOADED.—A provision in a cargo policy that the risk shall begin "from and immediately following the loading" of the property on board the vessel implies that the risk will begin with respect to any part of the cargo as soon as that part is loaded; and under the covering agreement for insurance, involved in this case, there was an insurable interest upon the whole cargo, to become effective and attach as the loading proceeded.

ID.—INTERPRETATION OF POLICY IN FAVOR OF INSURED—COVERING AGREEMENT.—The rules that policies of insurance are to be construed liberally in favor of the assured, and that courts are disinclined to construe stipulations in contracts as conditions precedent, are especially applicable to covering agreements for cargo insurance.

ID.—VALUED POLICY AS DISTINGUISHED FROM OPEN.—A covering agreement for insurance on the amount to be earned as freightage on a shipment of lumber, which provides that the amount of the insurance is to be "valued at actual freight," and which fixes the rate to be charged for the shipment will be construed as a valued rather than an open policy.

ID.—DECLARATION OF AMOUNT OF FREIGHTAGE—WHETHER MATERIAL OR CONDITION PRECEDENT.—In such case, when the loading was complete, the insured immediately became liable for the premium and the insurer became liable for any loss covered by the policy, without any declaration of the amount of freightage as soon as known

to the insured. Such declaration was not a condition precedent to the attachment of the risk, nor was the agreement therefor material to the risk, and the failure to make such declaration did not avoid the policy.

ID.—MATERIALITY OF WARRANTY—INTERPRETATION OF CODE SECTIONS.— Under sections 2608–2611 of the Civil Code, no right to avoid or rescind a subsisting policy of insurance occurs from the violation of any provision thereof, whether technically a warranty or not, unless such provision is material, except in cases where the policy itself declares that such breach shall avoid it. And the principles stated in sections 2608 and 2610 are not confined to implied warranties.

ID.—CONSTRUCTIVE TOTAL LOSS—NECESSITY OF ACTUAL ABANDONMENT.— Under section 2705 of the Civil Code it is not necessary, in order to constitute a constructive total loss under a policy of marine insurance, that there should be an actual abandonment; it is enough if the right to abandon exists.

ID.—RIGHT TO ABANDON WITH RESPECT TO FREIGHTAGE—WHEN EXISTS. This right to abandon exists, with respect to freightage, when the situation of the vessel, brought about by one of the perils insured against, is such that the cargo cannot be taken to its destination and the freightage thereby earned, "without incurring an expense to the insured of more than half the value of the thing abandoned."

ID.—EXISTENCE OF RIGHT OF ABANDONMENT—TIME OF DETERMINATION. The existence of the right to abandon, so as to make a constructive total loss, is determined by the situation at the time of the stranding. The question is whether at that time it was reasonably possible to bring the cargo into port without an expense of more than half its value, if the insurance is upon cargo, or if it is upon freightage, without an expenditure of more than half the amount thereof.

ID.—POLICY COVERING FREIGHTAGE—WHEN RIGHT TO RECOVER INSURANCE EXISTS.—In this action on a policy of marine insurance covering the freight to be earned on a shipment of lumber, the right to abandon existed and the loss was a constructive total loss for which the insured was entitled to recover, and the contention of the insurance company that because the cargo was partly saved, and because of the statement in the covering agreement that it was "free from partial loss and particular average," the loss was not within the terms of the policy, is untenable.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order refusing a new trial. J. M. Seawell, Judge.

The facts are stated in the opinion of the court.

Page, McCutchen & Knight, Page, McCutchen, Knight & Olney, McCutchen, Olney & Willard, and Ira A. Campbell, for Appellant.

Andros & Hengstler, and Louis T. Hengstler, for Respondent.

SHAW, J.—This is an action to recover $14,602.00 as the loss upon an alleged contract of insurance in the form of a covering agreement. The findings and judgment were in favor of the defendant. The plaintiff appeals from the judgment and from an order denying its motion for a new trial.

In its defense the assurance company claimed that there was no subsisting contract of insurance at the time of the loss, that, if there was such contract, it was avoided by the failure of the plaintiff to declare the amount of the risk as soon as it became known, or prior to the loss, and that the loss which occurred was not covered by the agreement.

The plaintiff was the owner of the steamship "Victoria." Swayne, Hoyt & Co. were its agents in San Francisco. Some time prior to February 28, 1903, the plaintiff, by Swayne, Hoyt & Co., had agreed with Renton, Holmes & Co., in San Francisco, to carry for the latter a cargo of lumber belonging to the Port Blakeley Mill Company from Port Blakeley on Puget Sound to Taku, in China, at a fixed rate per thousand feet, payable on arrival of the lumber at Taku. Plaintiff desired to insure the amount it would earn by carrying said lumber to China, under said contract, against the perils of the enterprise. Such earnings are called by the Civil Code, "freightage." (Sec. 2661.) For the purpose of obtaining this insurance, the covering agreement sued on was made. It was executed in San Francisco on March 6, 1903, the plaintiff contracting by Swayne, Hoyt & Co. and the assurance company by Livingston, Smith & Co., its general agents in San Francisco. At that time the vessel had left San Francisco and was at Port Blakeley, in process of being loaded with said cargo. The covering agreement consisted of an application made on behalf of the plaintiff and accepted by Livingston, Smith & Co. for the defendant. It was as follows:

"SWAYNE, HOYT & CO.

"Insurance is wanted by             ,Victoria Steamship Co.
For account of                      "
Loss, if any, payable to            "

For not to exceed $15,000 on freight on lumber on and under deck.

Valued at actual freight

shipped or to be shipped on board the Str. 'Victoria' at and from Puget Sound to Taku Bar.

"This insurance to be subject to the satisfactory survey and loading certificate of the surveyor of the board of marine underwriters of San Francisco at the port of loading.

"Free from partial loss and particular average.

"Rate of premium 1.10%.   Double on deck.

San Francisco, March 6, 1903.

"Binding in accordance with the terms and conditions of an ordinary San Francisco cargo policy as issued by this company.

"This application is not negotiable or transferable without the consent of this company.

"The assured agree to declare the amount as soon as known to them when a policy in accordance will be issued on payment of the premium.

"Accepted.              LIVINGSTON, SMITH & CO."

The loading of the vessel was not completed until March 12, 1903, and she sailed for Taku on that day.   The vessel had sailed from San Francisco in February and had touched at Port Gamble on Puget Sound and was at that place surveyed by the surveyor of the San Francisco board of marine underwriters on February 28, 1903, who on the same day made and issued his certificate that he considered the steamer "in suitable condition for loading a cargo of lumber for China."   She then proceeded to Port Blakeley and there on March 6th, had begun to take the lumber aboard.   This was the condition of the risk at the time the covering agreement was made.   It does not appear that the San Francisco agents of either party at that time had knowledge of the contents of the certificate or that the survey and certificate thereof had then been made.

1. The claim of the respondent that there was no subsisting contract of insurance at the time of the loss is in part based on the theory that the steamship company had no insurable

interest in the freightage at the time the covering agreement was made, nor until the cargo was completely loaded, and on the assertion that none of the lumber was taken aboard on March 6th.   The latter statement is not supported by the record.   It was admitted by the pleadings that on March 6, 1903, the steamship was at Port Blakeley "loading a cargo of lumber for Taku, China," being the cargo on which the freightage was to be earned.   Some of it must therefore have been loaded on that day.   The proposition that the owner of the loading steamer has no insurable interest in the freightage until the loading of the cargo is completed, is disposed of by the following provisions of our Civil Code.

"Sec. 2662.   The owner of a ship has an insurable interest in expected freightage which he would have certainly earned but for the intervention of a peril insured against."

The San Francisco form of cargo policy, referred to in the agreement, provided that the Civil Code of California should be conclusive and binding in regard to questions therein legislated upon and not provided for in said form of policy.   It also declared that the insurer thereby agreed to insure against "perils of the seas, fires, pirates, assailing thieves, jettisons, barratry of the master or mariners, and all other losses and misfortunes that have or shall come to the hurt, damage or detriment of the said property or interest, to which insurers are liable by the rules and customs of insurance in San Francisco, excepting such losses and misfortunes as are excluded by this policy."   Section 2662 gives the owner of a ship an insurable interest in expected freightage at least as soon as any cargo is loaded.   Some of the perils insured against in this case began as soon as any cargo was taken aboard, and the owner would then certainly earn the freight thereon, if none of such perils prevented.   Its right of freightage had begun and its responsibility for losses to cargo as well.   The form of the policy referred to in the covering agreement provides that the "adventure," that is the risk, shall begin "from and immediately following the loading" of the property on board the vessel.   This implies that it would begin with respect to any part of the cargo, as soon as that part was loaded.   It has been held that in cases where a ship sails under charter party to a distant port there to be loaded with freight to be carried to another port, the risk of the owner of freightage

to be earned begins in favor of the owner as soon as the ship leaves for the port at which the cargo is to be received. (*Robinson* v. *Manf. I. Co.*, 42 Mass. 143; *Hodgson* v. *Miss. I. Co.*, 2 La. 341; *Adams* v. *Western I. Co.*, 39 Mass. 163; *Melcher* v. *Ocean I. Co.*, 60 Me. 77.)   In view of all these circumstances and the authorities cited it is clear that there was an insurable interest upon the whole cargo, to become effective and attach as the loading proceeded.

2. The next objection to the existence of a subsisting contract, is the claim that by the terms of this agreement it was not to take effect except upon a condition precedent which has never happened.   This refers to the provision that the insurance was ''to be subject to the satisfactory survey and loading certificate'' of the surveyor of the board of marine underwriters at the port of loading.   It is contended that, by reason thereof, the contract did not take effect as a subsisting agreement until the vessel had been surveyed and loaded and the proper certificates of such survey and loading issued and submitted for approval to the defendant's agents in San Francisco, and not then, unless such certificates were, or should have been, ''satisfactory'' to such agents.   The ship and the loading were both satisfactory to the surveyor and he issued his certificates to that effect but the certificates were never exhibited to or approved by the defendant's agents in San Francisco.

''The rule of law is that policies are to be construed liberally in favor of the assured.''   (*Wells, Fargo & Co.* v. *Pacific Ins. Co.*, 44 Cal. 411.)   ''Any uncertainty or ambiguity in a contract of insurance is to be interpreted most strongly against the insurer.''   (*Goorberg* v. *Western Assur. Co.*, 150 Cal. 515, [119 Am. St. Rep. 246, 11 Ann. Cas. 801, 10 L. R. A. (N. S.) 876, 89 Pac. 132].)   ''Courts are disinclined to construe the stipulations of a contract as conditions precedent, unless compelled by the language of the contract plainly expressed.   The reason for this disinclination is that such a construction prevents the court from dealing out justice to the parties according to the equities of the case.''   (*Front Street etc. Co.* v. *Butler*, 50 Cal. 577; *Deacon* v. *Blodgett*, 111 Cal. 418, [44 Pac. 159]; *Antonelle* v. *Kennedy etc. Co.*, 140 Cal. 315, [73 Pac. 966].)   These well established rules apply with greater force to a covering agreement.   Such contracts, being

merely preliminary and intended to operate but for a short time, are usually couched in brief and general terms, the meaning of which is likely to be more or less obscure, unless aided by a consideration of the extrinsic facts and usages known to the parties.

In this case the empty vessel had been surveyed and the certificate thereof issued, as we have seen, seven days before the covering agreement was signed. The loading certificate was not made until the loading was completed. At that time the vessel would be ready for immediate departure. According to the evidence, the master would be expected to sail immediately upon the making of the latter certificate to the effect that she was properly loaded and seaworthy. In the ordinary course of events, that certificate could not have reached San Francisco for presentation to and approval by the agents of the insurance company there, until several days after the vessel would have sailed. During this interval it would be encountering the perils against which the owner desired insurance. According to the theory now advanced it would have been for that period wholly at the risk of the owner and the insurance would not have begun. Upon the same theory the owner could not have obtained insurance for that interval upon this contract unless it had detained the vessel until after the loading certificate had been received at San Francisco and approved by the insurance company, and further, until that fact could be communicated to the master. The defendant was a marine underwriter of San Francisco. The certificates of the survey and of the loading are each entitled "Board of Marine Underwriters of San Francisco," and are signed by "E. C. Genereaux, Surveyor." It is a fair inference and one consistent with the evidence in the case that the board of marine underwriters of San Francisco, mentioned in the agreement, was a board of which the defendant was a member, organized for some purpose in aid of the defendant's business. The surveys and certificates were apparently made in the usual and regular course of the surveyor's business, and it is to be presumed from this that it was his duty to survey each departing vessel, examine the stowage of its cargo, and certify the result for the parties concerned with the insurance of ship, cargo, or freightage. The agreement does not state that these certificates were to be forwarded to the agents

of either party, or that they were to be exhibited to the agents of the defendant. The evidence shows that it was not the custom to forward them to the insurer or to the board of marine underwriters at San Francisco. In view of all these circumstances and of the rules of construction above stated, it cannot reasonably be held that this provision was intended to be a condition precedent. The intention appears to have been that the condition of the ship and the stowage of the cargo must be of such a character that the surveyor of the port, upon making a survey thereof, would be, or should be, satisfied therewith, and to express the idea that if the condition was not satisfactory the insurers were at liberty to rescind the contract. If the surveyor was the defendant's agent for the making of the survey and certificates, his survey and approval were, in legal effect, that of the defendant. If he was the agent of both parties to ascertain and certify the facts, there was, at most, merely a condition subsequent, covenant or warranty which his certificates show was fully performed We are satisfied that the contract was a subsisting one and that the risk had attached before the vessel sailed from Port Blakeley.

3. The next point arises from the failure of the plaintiff to perform the stipulation that "The assured agree to declare the amount as soon as known to them, when a policy in accordance will be issued on payment of the premium." The "amount" here referred to is the amount of freightage to be earned by the plaintiff on the cargo. On March 12th, before departing from Port Blakeley, the master issued bills of lading to Renton, Holmes & Company, the charterers. The amount of freight was either stated or was ascertainable from these bills of lading, and the plaintiff's agents in San Francisco could have obtained advices of the amount within a few days thereafter by inquiry of the charterers at Port Blakeley. On April 9, 1903, the vessel was wrecked on a reef ninety miles from Taku, and the loss in question was caused thereby. The plaintiff did not declare to the defendant the amount of the freightage until May 8, 1903. The court found that the plaintiff knew, or by reasonable diligence could have known, said amount a long time before it declared the same, and that it was not true that it declared the amount as soon as known.

A considerable portion of the argument of the respondent on this point is founded upon the assumption that the covering agreement was, in legal effect, an open policy, and that the amount of insurance was thereby left wholly to the option of the assured to be manifested and determined by the declaration. This we deem to be a mistake. While at the time the agreement was made the exact amount of the insurance to be paid in case of a total loss was not known and could not be known until the lumber was loaded, yet the factors upon which the amount depended were all settled and fixed by the contract, so far as the parties were concerned. It was not an "open policy," in the ordinary sense of that term. The Civil Code contains the definition of that term and others involved in the question. "A policy is either open or valued." (Sec. 2594.) "An open policy is one in which the value of the thing insured is not agreed upon, but is left to be ascertained in case of loss." (Sec. 2595.) "A valued policy is one which expresses on its face an agreement that the thing insured shall be valued at a specified sum." (Sec. 2596.) "A running policy is one which contemplates successive insurances, and which provides that the object of the policy may be from time to time defined, especially as to the subjects of insurance, by additional statements or indorsements." (Sec. 2597.) The terms of the agreement show that the intention of the parties was to execute a "valued policy" so far as it was then possible to do so. It contains on this subject the phrase, "Valued at actual freight." This, in connection with the context and the attending circumstances, could only mean the actual amount to be earned as freightage on the lumber to be shipped. This amount would become fixed when the charterers, Renton, Holmes & Company, had put on board the cargo they wished to ship. The plaintiff was not left at liberty then to declare only a part of that amount. It had agreed to declare "the amount," that is the "actual freight," which means the whole thereof. The value was to be fixed by the quantity loaded, a matter which plaintiff could not control. When the loading was complete the plaintiff immediately became liable to the defendant for the premium and the defendant became liable for any loss covered by the policy, without any declaration thereof. The failure thereafter to make the declaration would not change the amount. The

policy, on its face, expressed an agreement by which the value of the thing insured was to be fixed by the quantity of lumber loaded and the amount of freight to be earned, regardless of the amount declared by the plaintiff. It was therefore, in substance, a valued policy. The value was not left to be ascertained "in case of loss," as it would have been if it had been an open policy, but was determined by facts which occurred before the departure of the ship; therefore it was not an open policy, as that term is defined in the code.

If we are correct so far, there can be no doubt that the policy was not a mere agreement upon a condition precedent, to become effective only in the event that the amount of freight was declared by the plaintiff, and it is clear that at the time the vessel departed for Taku, there was a subsisting agreement to insure the entire freightage on the cargo and that the liability of the defendant had then attached. The remaining question, under this head, is whether or not the failure to declare the amount avoided the policy, or at least gave the insurer a right to refuse the premium, rescind the agreement, and thereby avoid liability thereon.

4. "A statement in a policy, which imports that it is intended to do or not to do a particular thing which materially affects the risk, is a warranty that such act or omission shall take place." (Civ. Code, sec. 2608.) Section 2610 declares that "The violation of a material warranty, or other material provision of the policy, on the part of either party thereto, entitles the other to rescind." Section 2611 is as follows: "A policy may declare that a violation of specified provisions thereof shall avoid it, otherwise the breach of an immaterial provision does not avoid it." Under these provisions, no right to avoid or rescind a subsisting policy occurs from the violation of any provision thereof, whether technically a warranty or not, unless such provision is material, except in cases where the policy itself declares that such breach shall avoid it. This policy makes no such declaration. We cannot agree with the defendant's counsel in their contention that the principles stated in sections 2608 and 2610 are applicable only to implied warranties and that the principle of the common law that a violation of an express warranty avoids the policy, although the warranty be immaterial, applies to and controls this case. Under section 2608, with respect to a future act or omission,

and so far as the liability of the insurer is concerned, a warranty, whether express or implied, is to be deemed material only when it is "to do or not to do a thing which materially affects the risk." The "risk" here referred to is the liability of the insurer for a loss of the thing insured.

If this is the true meaning and application of the word "material" as used in the code, it is clear that the agreement to declare the amount as soon as known was not material to the risk. The maximum amount of the defendant's liability was irrevocably fixed by the completion of the loading upon which it depended. The subsequent declaration of a different amount by the plaintiff would not change the actual amount. It may well be that a subsequent declaration of a less amount, followed by the payment and acceptance of a premium based thereon would, upon principles of estoppel, reduce the liability to the amount declared, or avoid the policy, at defendant's option. But no such false declaration was made and that question is not involved. Furthermore, in that event the estoppel would arise directly from the payment and acceptance of the premium and not immediately from the declaration. The main reason for inserting this clause was not to have the amount fixed, but to obtain an early payment of the premium. While the true amount was not actually known at the time the agreement was made, the vessel had been for some time engaged in the lumber trade and its capacity was known. The amount of freight could be nearly approximated, and was in fact very closely approximated in this case. Since the amount of the risk was fixed by the quantity loaded, regardless of the declaration, it would follow that if no loss had occurred, the defendant could have demanded and collected the premium on the entire freightage even if a less amount had been declared, or if no declaration at all had been made. The fact that a loss did occur would not change this right. We perceive no reason why the same rule should not be applied to the plaintiff, in case of a loss. Its failure to declare would have no effect whatever either upon the amount at hazard, or upon the perils to be encountered during the voyage, and it would not tend to increase the danger of loss or the amount thereof. The case is in this respect similar to *Arnold* v. *Pacific etc. Co.*, 78 N. Y. 7. That case involved an open, running policy, to cover one-sixth of all goods shipped

by plaintiff prior to December 30, 1872, in vessels from Santos, in Brazil, "to New York, Baltimore, or Boston direct, or via Hampton Roads for orders." The risks applicable to the policy were to be reported to the insurance company for indorsement on the policy as soon as known to the assured. Goods were shipped at Santos in a vessel chartered to sail "from Santos to New York, Philadelphia or Baltimore, via Hampton Roads for orders." The assured, by mistake or inadvertence, reported the risk to the company as goods on board the ship, "from Santos to New York." The report did not mention Hampton Roads and the risk was indorsed on the policy without mention thereof. The ship stopped at Hampton Roads, remained there eighteen days, and was there wrecked and a total loss ensued. The question arose whether the mistake in the report and indorsement of the risk avoided the policy. There was no proof that the company was in any way harmed by the mistake. The rate was fixed by the policy and the value was correctly declared in the report. The court, after holding that the policy attached the moment the cargo was loaded, and that all the terms of the agreement were definitely determined, said: "Nothing was to be done at the time or after the declaration of the risk to make the contract complete. Even if the assured had made no declaration, the underwriter could claim that the property was covered by the policy and claim the premium for insuring it. The assured could not deprive it of its premium by simply omitting to report the risk. . . . If by accident or mistake, or some unavoidable necessity, the risk should not be reported before the loss under such a policy as this, it cannot be doubted that the risk would yet be covered by the policy. In such a case, the risk could be declared after the loss, and the declaration would be just as effectual then as if made before, unless damage to the underwriter from the delay could be shown. And if by mistake an erroneous declaration be made, it may be corrected even after the loss." In support of this proposition the opinion cites *Carver Company* v. *Manf. Ins. Co.,* 6 Gray (Mass.), 214; *Robinson* v. *Touray,* 3 Camp. 158; *Gledstanes* v. *Royal etc. Co.,* 5 Best and Smith, 797, [122 Eng. Reprint, 1026], and *Stephens* v. *Australasian Ins. Co.,* L. R., 8 C. P. 23, all of which declare the same principle. We can see no difference in principle between a report which failed

to state that the ship would call at a port at which it was to call and where the loss occurred, and the failure to make any report. The principle is that, as the voyage actually made was one permitted by the policy and all the terms necessary to the risk had been agreed upon, the failure to report it accurately, or at all, did not affect the risk, unless the company should prove damage from the failure, and that, for that reason, in the absence of a showing of damage, the breach was of an immaterial provision. So in this case, the agreement covered the whole freightage, the risk had attached and its amount was fixed the moment the vessel was loaded, no damage from the failure to report appears and consequently the failure did not affect the risk, the breach was of an immaterial provision and it did not avoid the policy or give defendant the right to rescind. There was no evidence of willful refusal to ascertain or declare the amount or that the failure was due to anything other than mistake, inadvertence, or neglect. The court found that they "neglected to declare the amount," but it did not find that they willfully refused or that they refused at all. Hence there is no foundation for the claim of defendant that the case comes within the *dictum* in the Arnold case that "if the assured willfully or fraudulently refuse to report a risk, they could not claim that it was yet covered by the policy."

The cases cited by defendant on this point are easily distinguished from the Arnold case and from the case at bar. In all of them the terms of the policy, or the nature of the risk, made the contract incomplete until something more was done or agreed to by one or both of the parties. In *Shearer* v. *Louisiana etc. Co.,* 14 La. Ann. 797, the policy did not determine the goods to be insured, the value thereof, the place or time of shipment, the mode of carriage, or the person insured. All these terms of the contract were to remain unascertained until the risk was reported. In *Edwards* v. *St. Louis etc. Co.,* 7 Mo. 382, the policy was on all shipments by water to or from St. Louis and any river port or from Atlantic coast ports to St. Louis and it specified that "indorsements on this policy to be the evidence of property, at the risk of the company under the same." There was no contract, nor any evidence thereof, as to any particular risk, until the indorsement was made, or at least until the risk was reported

and a proper indorsement thereof requested. The report was held to be a condition precedent, necessary to make a complete contract. In *Platho* v. *Merchants and M. I. Co.*, 38 Mo. 249, the policy insured Platho "in such sums, on property from and to such places, and on board such vessels as shall be specified by application and mutually agreed upon and written on this policy." It is beyond doubt that the indorsement and mutual agreement thereon were necessary to complete the contract as to any particular risk, and the court so held. In *Orient Company* v. *Wright*, 23 How. (U. S.) 401, [16 L. Ed. 524], the premium was to be fixed by the company and agreed to by the assured after the risk was declared. The assured claimed that upon a failure to agree upon the rate, it could be determined by arbitration and that the policy would attach in the mean time. The court denied this and held that there was no binding contract until the rate of premium had been agreed upon. These cases do not apply to the case at bar, because here all the terms of the policy were either expressly fixed or were susceptible of exact ascertainment by the facts existing at the time the vessel sailed, and could not be altered by the parties.

4. Lastly, the defendant contends that from the fact that the cargo was partly saved and because of the statement in the covering agreement that it was "free from partial loss and particular average," the loss was not within the terms of the policy. As we have seen, the policy form declared that the provisions of the Civil Code should control the rights of the parties, so far as they were not provided for in the policy. The code declares that: "A total loss may be either actual or constructive." (Civ. Code, sec. 2703.) This policy covered both kinds of total loss and it would be effective upon the occurrence of either. "A constructive total loss is one which gives to a person insured a right to abandon" the thing insured, as provided in section 2717. (Civ. Code, sec. 2705.) It is not necessary, under this section, that there should be an actual abandonment. It is sufficient to make a constructive total loss if the right to abandon exists. This right to abandon exists, with respect to freightage, when the situation of the vessel, brought about by one of the perils insured against, is such that the cargo cannot be taken to its destination and the freightage thereby earned, "without incurring

an expense to the insured of more than half the value of the thing abandoned." (Civ. Code, sec. 2717.) With respect to this policy, the thing abandoned was the freightage. The loss was caused by the stranding of the ship on a reef. There was an actual total loss and destruction of the ship and an actual abandonment thereof. No constructive abandonment was necessary as to the ship. Hence, the freightage could be constructively abandoned, notwithstanding the provision of section 2717 that "freightage cannot in any case be abandoned, unless the ship is also abandoned." The existence of the right to abandon so as to make a constructive total loss is determined by the situation at the time of the stranding. The question is whether at that time it was reasonably possible to bring the cargo into port without an expense of more than half its value, if the insurance is upon cargo, or, if it is upon freightage, without an expenditure of more than half the amount thereof. (*Ellicott* v. *Alliance I. Co.*, 80 Mass. 320.) The evidence shows that the first thing which was found necessary to that end was to jettison the lumber loaded on deck, that is, to throw it overboard in the hope of lightening the ship so as to get it off the reef. The freightage that would have been earned on this lumber, if carried to Taku, amounted to $1,776. This was a sacrifice made by the plaintiff to save the ship and cargo and earn the remainder of the freightage, if possible. Although it was not paid out directly as money, we can perceive no sound reason why it should not be considered a part of the expense necessary to forward the cargo to its destination. It was the same in effect as a direct expenditure of that sum of money would have been. It is a loss which under the rules of general average is to be charged in as a part of the general expenses of saving the ship and cargo which is apportioned between all the persons and interests benefited. (Civ. Code, secs. 2148 to 2155.) In this case it would have been so charged by the adjuster in computing the contributions to be made by the several interests to the general average expenses, except for the fact that at the time of the adjustment he understood that the deck load was not jettisoned to save the ship but was washed overboard by the waves. This was the allegation in the original complaint, but at the trial, upon the examination of the master as a witness, it was ascertained that it was in fact jettisoned

and the complaint was amended accordingly. The expenses in transferring the lumber to other vessels and taking it to Taku were adjusted in general average and the amount thereof chargeable to the freightage was fixed in two items, one of $5,226.85, which is designated in the findings as "the general average contribution of freight for services in the nature of salvage for cargo, rendered at the time of the wreck," and the other of $1,537.22 which the findings described as "expenses incurred in earning freight by trans-shipment." The testimony of the adjuster, which was not contradicted, was to the effect that the item of $1,537.22 was in fact a general average expense and should have been included with and added to the item of $5,226.85, but that, in making his statement on the adjustment, he had itemized it separately as a distinct charge of the same nature. These two sums were a part of the expense incurred on account of the freightage to get the cargo to its destination and earn the freightage insured. They were expenses to be taken into the account for the purpose of determining whether at the time of stranding the right to abandon existed. The three items of expense above mentioned amount in the aggregate to $8,540.07, which is more than half the freightage insured. It follows that the right to abandon existed and that the loss was a constructive total loss. The court erred in holding that the defendant was not liable on the policy, as upon a total loss, and in giving judgment against the plaintiff.

The plaintiff further claims that, under the terms of the policy form incorporated into the covering agreement, it is entitled to recover even if the loss be considered as partial only. The argument, as we understand it, is as follows: The declaration in the covering agreement that it is "binding in accordance with the terms and conditions of an ordinary San Francisco cargo policy as issued by this company," comes after the statement that the insurance is "free from partial loss and particular average" and immediately after the date line, and it appears from its language to be the statement of the company, intended as an amplification and modification of the covering agreement, so far as applicable. Applying the rule that policies should be liberally construed in favor of the assured, and the rule of section 1654 of the Civil Code, that an uncertainty should be interpreted most strongly

against the party who caused it, the provisions of the form should control, so far as they differ from the covering agreement and are in favor of the assured. The form of policy provides that "All merchandise not excepted under the following memorandum clause, also freight, is hereby warranted by the insured free from particular average and partial loss, and is insured against loss or damage only when occasioned by stranding, sinking, fire, collision or other extraordinary peril, and amounting to fifty per cent or more, on the sound value of the whole shipment at the port of delivery." As to the freight, the last clause means the entire freight to be earned by carriage to the port of delivery. This, they say, would make the insurer liable for insurance of freightage in a case of loss by stranding, when the loss equals fifty per cent of the freightage insured, although not actually or constructively total, that is, as to this case, regardless of the existence of the right to abandon. Such loss they argue consisted of the actual loss of $3,901.18 in freightage, including that on the lumber jettisoned, and the additional expense occasioned by the wreck of the ship, and necessary to forward the cargo, that is, the proportion of the general average expenses thereby caused which was justly chargeable to the interest of freightage, in addition to the jettison, being $6,764.07, making a total of $10,665.25. The actual net receipts on the freightage were but $3,936.75. The difference, it is claimed, was the loss caused by the stranding. Inasmuch as we have concluded that plaintiff should recover on other grounds, it is not necessary to determine whether or not this argument is sound, or whether this is the effect of the clause in the policy form above quoted.

The judgment and order are reversed.

Angellotti, J., and Sloss, J., concurred.

Hearing in Bank denied.

Beatty, C. J., dissented from the order denying a hearing in Bank.