Manuel G. ROSA, Managing Owner, Circle L Investment Corporation, Antonia Garcia Da Rosa, John H. Avila, Manuel Pestana, Victorino Garcia Da Rosa, Manuel De Souza, Jose Da Graca, Jose Enginio Da Graca, Edward J. Correia, Libelants,

v.

The INSURANCE COMPANY OF the STATE OF PENNSYLVANIA, a corporation, Respondent.

Civ. No. 67–47.

United States District Court
S. D. California.

Jan. 14, 1969.

Curran, Golden, McDevitt & Martin, by Robert O. Curran, San Diego, Cal., for plaintiffs.

William James Zumwalt, San Diego, Cal., for defendant.

## MEMORANDUM OF DECISION

KUNZEL, Chief Judge.

This is an in personam admiralty suit against the insurer of the lost vessel BELLE OF PORTUGAL. Pursuant to a time hull policy issued by defendant on October 31, 1966, plaintiffs seek $215,-000.00 for loss of the vessel, and $9,000.-00 for loss of the power skiff. Plaintiffs also seek $99,140.00 for loss of fish aboard the vessel pursuant to two cargo policies issued by defendant on September 6, 1966, and November 1, 1966.

## LOSS OF THE VESSEL

The BELLE OF PORTUGAL sailed from San Diego on her last voyage on September 14, 1966, and was lost at sea off the coast of South America on December 19, 1966. The ship's log and the testimony establish that an electrical fire erupted in the engine room at about 0515 due to an electrical short in the main switchboard. The man on wheel watch spread the alarm. The assistant engineer and the chief attemped to put out the fire with dry chemical extinguishers but were forced to withdraw because of heavy smoke. The engine room doors were then closed and the C. O. 2 system discharged. The C. O. 2 failed to extinguish the fire. The power skiff was launched and the crew taken off board. The vessel sank at about 0950. The crew was picked up by the British freighter PORT ADELAIDE at about 1000.

Defendant, from time to time, raised a multitude of defenses. However, these were boiled down in the pretrial order, and at the trial, to the following:

1. That the loss was caused by negligence of a shoreside electrical repairer.
2. That the vessel was unseaworthy by reason of a fuel oil leak into the bilges, and this unseaworthiness was known to the owner.

Captain Jose Victor Goulart testified that in the early part of the trip there was a broken fuel pipe which caused a

leakage of fuel into the bilges; however, it was soon repaired.

There is testimony that an excess amount of fuel was used by the vessel on the trip. Therefore, defendant contends the fuel oil accumulated in the bilges and fed the fire.

The testimony of Captain Goulart, and the log entries, indicate that from December 7th through December 10th, 1966, there was considerable difficulty with the bilge pumps. However, on December 11, 1966, the following entry was made in the deck log:

> "Port No. 1 Well has a *amonia* leak a 12 ton well, we corrected a *serculated* pump *trught* the *bildge* line first in care of * * *

> "a minor *troble* with the *bildge* pumps we can pump *trught* that well.

> "Got *troble* with the *bildge* pumps, have repair this today so far we got things under control."

Mr. Ferreira made an affidavit which was marked as Exhibit F for identification, in which he stated that, "The vessel was in such poor condition on the last trip it should not have gone out before repair.", and, "The boat was out 3 months before she sunk and in my opinion, she should not have gone out in the first place because of her leaking condition, and poor operation of the motor." This affidavit was made in connection with Mr. Ferriera's disability claim against defendant as the P. & I. carrier, for injuries which occurred on board the BELLE OF PORTUGAL on her last voyage.

Mr. Ferriera's testimony was taken at his home under very adverse conditions. He appeared to be quite ill. In substance, he testified that he had made the above statements to the attorney for defendant. However, he stated he made these statements because he was angry with Manuel G. Rosa, the managing owner of the vessel, because Rosa had refused to pay his hospital bill. He further stated that he was confused when he made the statements, and that he would not have gone out on the vessel if the statements were true. In view of the testimony of Ferriera, the statements contained in the affidavit to the attorney for defendant are discounted.

A condition survey of the vessel was made on February 9, 1966, by Captain B. H. Smith, a marine surveyor, a copy of which was furnished to defendant prior to the issuance of the policies here in question. The survey and the testimony of Captain Smith evidence that the vessel was in satisfactory condition at the time of the survey. Captain Smith testified that in his opinion the vessel at that time was fit to engage in her intended task.

Manuel G. Rosa, managing owner of the lost vessel, who also owns and manages three other large purse seiners, testified that he had no knowledge of any defects in the vessel and that he authorized any repairs to the vessel that were requested by the chief engineer. He further testified "that he told the machine shop to do everything that needed to be done."

Some evidence was introduced by defendant to the effect that excessive oil in the bilges would have caused the fire to spread more rapidly and prevent the successful fighting of the fire. This testimony was countered by testimony offered by plaintiffs to the effect that oil in the bilges would not have increased the fire potential for various reasons. This latter testimony, because of the qualification of the expert, is given more credence than that offered by defendant. Further, there is no evidence that the excess fuel remained in the bilges.

The "California Fishing Vessels (1959)" attachment to the policy is standard in form and contains a common perils clause which states in part:

> "Touching the adventures and perils which we the said Assurers, are contented to bear and take upon us, they are of the seas, * * * fire. * *"

The policy provides:

> "Warranted to be subject to English law and usage as to liability for and settlement of any and all claims."

Defendant offered to prove that if an expert in electrical engineering were called he would have testified "that the fire aboard the BELLE OF PORTUGAL was directly caused by the negligence of a shoreside electrical repairer * * *", which electrical repairs were accomplished during a two-year period prior to the loss.

An objection to the offer of proof was sustained. The defense is not tenable, and as far as known to the court, has not been raised in recent times.

In 2 Arnould Marine Insurance, 15 Ed. 1961, ¶ 818, p. 774, it is said:

"It was for a long time a vexed question whether the underwriters, under a policy in the common form, were liable for a loss proximately caused by fire, but remotely occasioned by the negligence of the master and crew or other agents of the assured. This question in our law is now, as we have already seen, settled in the affirmative. And, after some fluctuation in the decisions, the law in the United States was settled in the same way."

With the exception of the discounted statement of Mr. Ferreira, there was no evidence offered by defendant that the vessel was unseaworthy at the commencement of its voyage, nor was any evidence offered that the owners had any knowledge of any unseaworthy condition at the time of the sailing of the vessel or thereafter. Further, no evidence was introduced that there was any misrepresentation, concealment, or fraud on the part of the owners in securing the policy.

■ Under English law there is no implied or express warranty of seaworthiness in a time hull policy. 2 Arnould, supra, ¶ 706, pp. 668, 669. In fact, section 39(5) of the Marine Insurance Act of 1906 provides:

"In a time policy there is no implied warranty that the ship shall be seaworthy at any stage of the adventure, but where, with the privity of the assured, the ship is sent to sea in an unseaworthy state, the insurer is not liable for any loss attributable to unseaworthiness."

■ Assuming that there were defects which could be said to have caused the vessel to be unseaworthy at the outset of the voyage, and assuming that the owner had knowledge of the defects, this would still not be a defense because there was no evidence of any kind offered that any of these defects proximately caused the fire or the sinking of the vessel.

■ Under English law, in order for an insurer to avoid a time hull policy, the unseaworthiness to which the owner is privy must be the proximate cause of the loss. 2 Arnould, supra, ¶ 707, p. 669.

Of special interest in this field are:

Tropical Marine Prod. v. Birmingham Fire Ins. Co. of Pa., 247 F.2d 116 (5th Cir. 1957)

Saskatchewan Government Ins. Office v. Spot Jack, 242 F.2d 385 (5th Cir. 1957)

New York, New Hampshire & Hartford R. Co. v. Gray, 240 F.2d 460 (2d Cir. 1957)

Gulf Coast Trawlers, Inc. v. Resolute Ins. Co., 239 F.Supp. 424 (S.D.Tex. 1965)

■ As to this portion of plaintiffs' claim, defendant's rejection of the claim was arbitrary and without any justification. Plaintiffs' Exhibit 18, which contains correspondence between the carrier and its local agent, supports this conclusion. It is clear that no legal defense existed and, therefore, prejudgment interest will be granted in the amount of 7 per cent from April 1, 1967, to date of judgment. The April date is fixed as a time when defendant's investigation should have been completed.

■ In Admiralty, the granting of prejudgment interest is discretionary. Gardner v. National Bulk Carriers, Inc., 333 F.2d 676 (4th Cir. 1964).

## LOSS OF THE SKIFF

After the loss of the vessel the crew, in the skiff of the BELLE OF POR-

TUGAL, was picked up by the British freighter PORT ADELAIDE. The crew of the PORT ADELAIDE attempted to hoist the skiff aboard but was unsuccessful and it sank. Captain Goulart testified that he was told that the operation of hoisting the skiff aboard by the crew of the PORT ADELAIDE was not properly done. Defendant contends that the proximate cause of the loss of the skiff was the negligence of the crew of the PORT ADELAIDE, and, therefore, not covered. Again, as far as is known, this defense has never been raised under circumstances such as here, and no cases have been cited by either party. In fact, a plain reading of the policy does not support any such defense.

 Paragraph 8 of the attachment provides:

"If the insured vessel is disabled or in distress, a towing vessel may be engaged with release of towers liability. Underwriters waiving subrogation against such towing vessel."

This clause necessarily implies that if the vessel is in distress by reason of a peril insured against, assistance could be engaged, whether it be a tow or hoist. The clause further implies that if a release were not given, the underwriters would have a right of subrogation against the hoisting vessel if a loss were due to its negligence.

██ Furthermore, paragraph 1 of the attachment contains a standard "sue and labor" cause which, under English law, allows the assured to be reimbursed for expenses incurred by the hiring of salvors to save the vessel. 2 Arnould, *supra*, ¶¶ 861–862, pp. 824–825. The sue and labor clause further provides that this can be done by the assured "without prejudice to this insurance." This clause certainly implies that where the assured engages another, expressly or impliedly, to save the vessel, and such person acts negligently, that the engagement is without prejudice to the insurance.

██ Regardless of the policy provision, it would be less than common sense to hold that under the existing circumstances the assured be relegated to a claim against the "Good Samaritan."

This claim will also be allowed prejudgment interest in the same amount and for the same period as for the previous claim.

### LOSS OF THE CARGO

There are two policies involved, CEE–1903 and CEE–1904, both containing the same provisions. CEE–1903 covers a period from September 6, 1966, to noon November 1, 1966, and CEE–1904 covers a period from noon November 1, 1966, to noon November 1, 1967.

The deck log indicates that the vessel caught 5 tons of tuna on October 20, 1966, and caught no fish until November 16th when 8 tons of tuna were caught. Thereafter, between November 24th and December 1st, an additional 55 tons were caught. No more fish were caught until December 9th, and between December 9th and 16th an additional 222 tons were caught. The deck log evidences these figures. While there was some question regarding the reporting of the fish aboard, the evidence is substantial and credible that on December 7, 1966, the master of the BELLE OF PORTUGAL reported to Alvin Rosa, son of one of the owners, who was acting in a managerial capacity, that the vessel had approximately 70 tons of fish aboard. Alvin Rosa relayed this report on the same day to Mr. Charles T. Carl, the insurance agent. Captain Goulart testified that during the last three days of the voyage he was unable to report because of heavy rain which curtailed the sending capacity of the radio.

Defendant primarily contends that the failure to report in accordance with the following provisions of the policy prevented the cargo policy from attaching since the amount reported was less than one-fourth of the 300-ton carrying capacity of the vessel.

"No insurance shall attach hereunder unless message is received and confirmed in San Diego that the vessel had taken on a load of not less than one-fourth of her carrying capacity."

Inasmuch as there is an absence of any federal statutes or federal case law which has interpreted the type of marine policy herein involved, the law of the State of California, where the policy was issued, applies. Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955).

The California and universal rule is that if there is an ambiguity or conflict in the provisions of an insurance policy, such is to be resolved by a construction in favor of the assured. 27 Cal. Jur.2d, Insurance § 276, p. 773.

An ambiguity and conflict is immediately noted upon examination of the first paragraph of the provision upon which defendant relies. It reads:

"2. ATTACHMENT AND TERMINATION OF INSURANCE. Insurance to attach when vessel(s) advise Carl and Carl Insurance Inc. of the amount of fish on board. Vessel is permitted to report at various times throughout the voyage."

The conflicting provisions are enough to confuse a lawyer, let alone a layman. Furthermore, it has been held in California that such a provision as defendant relies upon is not a condition precedent to the attachment of insurance. Victoria S. S. Co. v. Western Assoc. Co. of Toronto, 167 Cal. 348, 139 P. 807, 811 (1914).

The policy contains the following provision in paragraph 6.

"This Company is entitled to premiums at agreed rates, on all shipments reported or not."

Thus, in one breath, defendant contends the policy does not attach until one-fourth of the vessel's carrying capacity has been reported, and in the next breath they say regardless, we are entitled to our premium. A California case has held this to be incongruous. Wells Fargo & Co. v. Pacific Ins. Co., 44 Cal. 397, 413 (1872).

In paragraph 10 it is provided:

"This Policy shall not be prejudiced by any unintentional delay or omission in the reporting hereunder. * * * "

The above Errors and Omission clause certainly applies here. There was never any intentional delay or omission in reporting. There is no evidence that there was any intent not to report.

Defendant further contends that if the vessel is unseaworthy at any stage of the voyage such is a complete defense regardless of proximate cause. The California rule is otherwise.

"CALIFORNIA INSURANCE CODE —Implied Warranties Peculiar to Marine Insurance

Sec. 1920. Seaworthiness. In every marine insurance upon a ship or involving transportation by ship, a warranty is implied that the ship is seaworthy. (Stats. 1935, c. 145, p. 589, § 1920.)

Sec. 1921. Seaworthy defined. A ship is seaworthy when reasonably fit to perform the services and encounter the ordinary perils of the voyage contemplated by the parties to the policy. (Stats. 1935, c. 145, p. 589, § 1921.)

Sec. 1922. Compliance with warranty. An implied warranty of seaworthiness is complied with if the ship is seaworthy at the time of the commencement of the risk, except in the following cases:

(a) When the insurance is made for a specified length of time, the implied warranty is not complied with unless the ship is seaworthy at the commencement of every voyage it undertakes during that time.

(b) When the insurance is upon the cargo and, by the terms of the policy, description of the voyage, or established custom of the trade, the cargo is to be transshipped at an intermediate port, the implied warranty is not complied with unless each vessel upon which the cargo is shipped or transshipped is seaworthy at the commencement of its particular voyage. (Stats. 1935, c. 145, p. 589, § 1922.)"

There is no substantial evidence in the record upon which to base a finding other than that the vessel was

seaworthy upon the commencement of the voyage. Therefore, the cargo claim is allowed without prejudgment interest, there being no dispute as to its value.

This memorandum shall constitute the findings of fact and conclusions of law. Counsel for plaintiffs shall prepare, serve, and lodge a judgment in accordance herewith.