**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**July 25, 2005**

Charles R. Fulbruge III
Clerk

REVISED AUGUST 15, 2005

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 04-20819

———————————

WENTWOOD WOODSIDE I LP,

Plaintiff-Appellant,

versus

GMAC COMMERCIAL MORTGAGE CORPORATION;
ROYAL INDEMNITY COMPANY,

Defendants-Appellees.

———————————

Appeal from the United States District Court
for the Southern District of Texas

———————————

Before GARWOOD, SMITH, and CLEMENT, Circuit Judges.

GARWOOD, Circuit Judge:

Wentwood Woodside I, L.P., a Texas limited partnership,
(Wentwood) brought this suit against Royal Indemnity Company
(Royal), which carried the excess property damage insurance on
the apartments Wentwood owned, and against GMAC Commercial
Mortgage Corporation (GMAC), which serviced the mortgage on
Wentwood's apartments, to recover under Texas law for flood

damage to the apartments sustained during Tropical Storm Allison in June of 2001. The district court granted summary judgment to both Royal and GMAC on all causes of action. We affirm.

## I.

### CONTEXT FACTS AND PROCEEDINGS BELOW

Wentwood is a single-asset limited partnership organized under the laws of Texas. It was formed for the purposes of profitably owning the Woodside Village Apartments (Woodside Village) in Houston, Texas. On December 30, 1996, Wentwood, as sole grantor, executed a deed of trust with Column Financial, Incorporated, the deed of trust beneficiary, in order to finance Wentwood's purchase of the Woodside Village.

The indebtedness secured by the deed of trust was acquired (and possibly initially funded) by a New York common law trust structured as a real estate mortgage investment conduit (REMIC). Neither this REMIC nor Column Financial is a federally regulated lending institution. The trustee for the REMIC is LaSalle Bank of Chicago. LaSalle merely holds the REMIC's assets in trust, is not the lender, and is not at risk in the event of default by any of the REMIC's debtors, including Wentwood. The deed of trust covers no property other than Woodside Village and secures no indebtedness other than Wentwood's $5,950,000 indebtedness incurred in its purchase of Woodside Village. The deed of trust expressly requires Wentwood to maintain adequate insurance on

2

Woodside Village.  The only address for Wentwood stated in the deed of trust is 3811 Turtle Creek Boulevard, Suite 450, Dallas, Texas 75219.  GMAC services the indebtedness secured by the deed of trust.

Wentwood is, in some not precisely identified manner, affiliated and under common control with a number of other separate partnerships owning other apartment buildings (over 50 in all) across the country, including seven other single-asset partnerships each of which owns a different apartment building in Houston.  Among these seven other single-asset partnerships (each owning other Houston apartment buildings) were Wentwood Hartford D Partners (Wentwood Hartford) and Wentwood St. James, L.P. (Wentwood St. James).  Woodside Village and the other seven Houston properties were at all relevant times managed by Pinnacle Realty Management Company (Pinnacle) in Tacoma, Washington.

On April 20, 2000, the Federal Emergency Management Agency (FEMA) redrafted its flood insurance rate map for the Houston area.  Under this change, the Woodside Village became included within Flood Zone A, a special flood hazard area (SFHA).  On September 14, 2000, FEMA published its revisions, including the one affecting the Woodside Village, in the Federal Register.  65 F.R. 55526-03.

On September 19, 2000, GMAC sent a letter to Wentwood Hartford, informing it that its property was in an area that had

3

been designated an SFHA. GMAC explained, though without citing any contractual language, that Wentwood Hartford was required by its mortgage (which GMAC serviced) to provide GMAC with evidence of adequate flood insurance.[1] If such evidence was not forthcoming, the letter stated, GMAC would procure such insurance at Wentwood Hartford's expense. GMAC sent an essentially identical separate letter on the same day to Wentwood St. James, likewise informing it that its property in Houston was in an area designated an SFHA. GMAC did not send such a letter to Wentwood even though the Woodside Village was also in an SFHA as a result of FEMA's April 2000 changes to its rate maps.

GMAC addressed this correspondence specifically to Wentwood Hartford and Wentwood St. James but the letters were sent in care of Pinnacle to the latter's Tacoma address. Once the letters were received by Pinnacle, they were forwarded to Janet Barnes, who was at the time the risk manager for Boreal Properties, L.L.C. (Boreal), a company affiliated with Pinnacle that worked on the eight Houston properties as an independent contractor. Barnes states in her affidavit that she was responsible for maintaining insurance for the Houston properties. There is no evidence that Barnes took any immediate action following receipt

---

[1] The mortgage documents of the seven other Houston properties are not in the record. An affidavit of Wentwood's attorney states, "on information and belief," that each of the eight separate loans on the eight separate Houston properties is included in the same REMIC and that all loans in the REMIC are serviced by GMAC.

4

of GMAC's letters.

At some point in late 2000, a firm named Graoch Associates (Graoch), acting on behalf of the affiliated group of partnerships which included Wentwood, retained Lockton Companies, Incorporated (Lockton) to purchase a single excess property insurance policy covering all of the properties, including the Woodside Village, owned by all the various partnerships (including Wentwood) with which Wentwood was affiliated and under common control. Lockton entered into negotiations with Richard McAdam, a property underwriter for Royal Specialty Underwriting, Incorporated, to purchase excess insurance from Royal. Royal's standard form excess property insurance policy generally covered flood damage but excluded from that coverage any property located in an SFHA. An exception to this exclusion could be purchased for an additional premium.

During the underwriting process, McAdam specifically asked Lockton whether any of the properties was located in an SFHA. As reflected in the policy itself, Lockton only identified three properties as being in an SFHA, one each in Ohio, North Carolina, and Texas. The sole Texas property so identified was the Houston property owned by Wentwood St. James, which was the subject of one of GMAC's letters. Lockton did not, however, identify either the property owned by Wentwood Hartford, which was the subject of GMAC's other letter, or, more importantly, the Woodside Village

5

owned by Wentwood.

From the policy's inception forward, the Royal policy's Excess Physical Damage Schedule read in its entirety as follows:

> "Perils Covered: All Risk including Flood and Earthquake except excluding California Earthquake and excluding Flood in Zone A or V except at: 1) 2400 West Shore Blvd. Columbus, OH, 2) 215 Rippling Stream Rd., Durham, NC, 3) 9109 Fondron [sic] Road, Houston, TX."

Consequently, when Graoch purchased its one-year excess policy from Royal, which became effective on November 27, 2000, the Woodside Village did not have excess coverage for floods and the premium paid by Graoch did not incorporate the risk of insuring the Woodside Village against flood damage. The parties do not dispute that Wentwood breached its express duty under the deed of trust to maintain full replacement cost flood insurance.[2]

In the spring of 2001, Graoch decided to switch primary carriers. It purchased a one year policy from Lexington Insurance Company (Lexington), effective April 28, 2001, with a $1,000,000 limit. The Lexington primary policy included full flood coverage and did not exclude properties in an SFHA. Thus, the Woodside Village continued to have primary flood insurance, but still did not have any excess flood coverage.

---

[2] The deed of trust requires that whenever the property is in an area designated by FEMA as SFHA (including either Zone A or Zone V) the grantor at its expense must maintain flood insurance equal to 100% of the replacement cost of the improvements or the maximum flood insurance available, whichever is less.

6

On June 9, 2001, Tropical Storm Allison came ashore in the Houston area.  The Woodside Village was severely flooded and sustained more than four million dollars in damage.  Wentwood filed a claim with Lexington four days later and Lexington promptly paid its policy's full $1,000,000 limit.  Wentwood next filed a claim with Royal under its November 27, 2000 excess policy purchased by Graoch.  Royal refused to pay, however, because it determined that the Woodside Village was in an SFHA and Graoch had not purchased the additional coverage necessary for such a property.

In July 2002, Wentwood filed a three-count complaint in a Texas court alleging breach of contract by Royal, violation by Royal of the Texas Insurance Code, and breach by GMAC of an assumed duty to notify Wentwood in the event that the Woodside Village fell within an SFHA.  The case was timely removed on August 13, 2002 to the district court below.  In November 2002, Wentwood filed an amended complaint which pleaded two additional causes of action against GMAC for negligence *per se* under Texas law in failing to abide by its asserted federal statutory duty under 42 U.S.C. § 4012a to ensure that properties in SFHAs were adequately covered, and violation of section 4012a.  The district court granted summary judgment to Royal on September 12, 2003,

7

and then to GMAC on August 31, 2004.[3] The district court had also, in February 2004, denied Wentwood's motion, filed in November 2003 after the court rendered its September 2003 adverse summary judgment order, to file a further amended complaint against Royal.

It is from these dispositions that Wentwood appeals.

## II.

### ROYAL

Wentwood appeals the grant of summary judgment in favor of Royal on the ground that Wentwood's initial failure to insure the Woodside Village was a mistake that is excused by the Errors and Omissions clause of the underlying primary policy. Wentwood also appeals the decision of the district court not to permit it to file an amended complaint against Royal after the adverse summary judgment had been entered.

**A.   The Summary Judgment for Royal**

**i.   Standard of Review**

A grant of summary judgment is reviewed *de novo* under the

---

[3] Judge Hughes generally referred the case to Magistrate Judge Crone in September 2002. The parties thereafter agreed to trial before and disposition by Judge Crone, who presided over the first phase of this case and entered summary judgment in favor of Royal. Judge Crone was then confirmed to a district judgeship in another district and on October 7, 2003, the case was returned to Judge Hughes, who entered summary judgment in favor of GMAC. Thereafter Judge Hughes on September 6, 2004 entered final judgment under Rule 58 that Wentwood take nothing from Royal and GMAC. We generally refer to Judges Crone and Hughes collectively as the district court.

8

same standard applied by the district court. *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002).

### ii. Discussion

Wentwood concedes, as it must, that the Royal policy Graoch purchased did not identify the Woodside Village as a property to be excepted from Royal's blanket exclusion from flood coverage of any property in an SFHA. This is not a mere misdescription in the policy of the coverage upon which Graoch and Royal agreed and for which Graoch paid. Rather, Graoch never asked for SFHA coverage for the Woodside Village and never paid for such coverage.

Wentwood contends, however, that this failure to insure the Woodside Village was an oversight that is nullified by the Errors and Omissions clause of Lexington's primary policy. This clause provides:

> "Any unintentional error or omission made by the Insured shall not void or impair the insurance hereunder provided the Insured reports such error or omission as soon as reasonably possible after discovery."

Wentwood argues that the Errors and Omissions clause was incorporated into the Royal policy by its Maintenance of Primary Insurance clause, which provides:

> "*In respect of the perils hereby insured against*, this Policy is subject to the same warranties, terms and conditions (except as regards the premium, the amount and limits of liability other than the deductible or self-insurance provision where applicable, and the

> renewal agreement, if any; and EXCEPT AS
> OTHERWISE PROVIDED HEREIN) as are contained
> in or as may be added to the policy/ies of
> the primary insurer(s) prior to the happening
> of a loss for which claim is made hereunder,
> and should any alteration be made in the
> premium for the policy/ies of the primary
> insurer(s), then the premium hereon shall be
> adjusted accordingly."

(italics added, capitals in original).

Wentwood asserts repeatedly throughout its brief that *its* failure to insure the Woodside Village was the result of *its* unintentional error when purchasing the excess policy from Royal. The summary judgment evidence, however, shows only that the Royal policy was purchased by Graoch. Presumably, therefore, the only relevant errors or omissions are those committed by Graoch.

There is, however, no evidence whatsoever that Graoch's agent, Lockton, did not know that the Woodside Village was in an SFHA or, if the agent did not know that, that the agent would have purchased the additional insurance if he or she *had* known that the property was in an SFHA. There is evidence that Barnes did not know the Woodside Village was in an SFHA when Graoch bought the policy, but there is no basis in the record for treating Barnes' knowledge, or lack thereof, as equivalent to Graoch's or Lockton's knowledge. All we know of Barnes from her affidavit is that her firm, Boreal, was retained by Pinnacle to "provide[] risk management services as an independent contractor to the [eight Houston-area properties]." Yet neither Boreal, nor

10

Pinnacle, nor Wentwood itself purchased the Royal policy. Nevertheless, even if we assume that there was an "unintentional error or omission made by the Insured" in respect to not procuring flood coverage for its Woodside Village under the Royal policy, the Maintenance of Primary Insurance clause in Royal's excess policy only incorporates the terms of the underlying Lexington primary policy "[i]n respect of perils hereby insured against." As noted earlier, however, the Excess Physical Damages Schedule, which listed "Perils Covered," did not include as a covered peril the flooding of any property within an SFHA other than three enumerated exceptions, none of which was the Woodside Village. Therefore, by the plain terms of the above-quoted language, the Errors and Omissions clause was not incorporated into the Royal policy with respect to flood damage in an SFHA unless, unlike in the instant case, the special exception was purchased. *Sulzer Carbomedics v. Or. Cardio-Devices, Inc.*, 257 F.3d 449, 457 (5th Cir. 2001) (stating that an unambiguous contract "must be enforced as written, looking at the objective intent as manifested by the language used, rather than interpreting it by attempting to divine the subjective intent of the parties.") (citing *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981)).

This analysis underscores the central defect in Wentwood's contract claim against Royal. The undisputed facts of this case

11

establish that Graoch simply never purchased excess flood insurance for the Woodside Village.  Indeed, in response to a direct inquiry about properties in an SFHA, Lockton did not identify the Woodside Village and the premium Graoch paid did not include the risk of insuring the Woodside Village against flood damage.  Regardless of whether we ascribe this error to Wentwood or Graoch, such an error is properly characterized as a unilateral mistake in purchasing insurance.  Under Texas law, the unilaterally mistaken party alone bears responsibility for the consequences of its error.  *See, e.g., Holley v. Grigg*, 65 S.W.3d 289, 295 (Tex. App. – Eastland, 2001, no writ); *Oldaker v. Travelers Ins. Co.*, 497 S.W.2d 402, 404 (Tex. App. – El Paso, 1973, no writ); *GeoSouthern Energy Corp. v. Chesapeake Operating, Inc.*, 274 F.3d 1017, 1021 (5th Cir. 2001) (citations omitted) (stating that equitable reformation of a contract is available only when a *mutual* mistake in drafting prevents the written instrument from reflecting the meeting of the minds).

Nevertheless, even if we were to assume that the Errors and Omissions clause was incorporated into the Royal policy with respect to the Woodside Village, it still would not apply.  The Errors and Omissions clause states that an unintentional error will not "void or impair the insurance hereunder[.]"  The Errors and Omissions clause, in other words, applies only to insured risks.  Yet, for the reasons discussed above, there was no

12

"insurance hereunder" with respect to flood damage because Graoch never purchased such insurance for the Woodside Village.

The cases Wentwood cites for the proposition that the Errors and Omissions clause applies are distinguishable on their facts. For example, in *Rosa v. The Ins. Co. of Penn.*, 296 F. Supp. 167 (S.D. Cal. 1969), an insurer tried to avoid paying for the loss of cargo that went down with a fishing vessel on the ground that the cargo had not been reported via radio as required under the policy. The vessel was not able to report its cargo, however, because it was crippled by the storm that would eventually claim it. The district court ruled that the failure to report was excused by the Errors and Omissions clause of the policy because there was no evidence that the vessel's crew did not intend to report. The obvious distinction between *Rosa* and the instant case is that there was no dispute in *Rosa* that cargo insurance had been purchased and a premium paid. As such, an unintentional violation of a policy technicality was not construed to impair coverage. In the instant case, on the other hand, there was no insurance coverage and no premium was ever paid.[4]

---

[4] Other cases relied on by Wentwood are likewise distinguishable. In *Conagra, Inc. v. Arkwright Mut. Ins. Co.*, 64 F. Supp. 2d 754 (N.D. Ill. 1999), Conagra sought to recover for property that was destroyed in a fire but not properly listed in the policy. The district court ruled that the Errors and Omissions clause in that case, which specifically addressed errors or omissions in the listings of covered properties, *id*. at 760, and is substantively different from the language of the Errors and Omissions clause in the instant case, would correct a

In light of the conclusion that Wentwood never insured the Woodside Village against flood damage, Wentwood's lawsuit is in effect an attempt to retroactively purchase excess insurance for a loss that has already been realized. In *Simon v. National Union Fire Insurance Co.*, 782 N.E.2d 1125 (Mass. App. Ct. 2003), the court held, respecting a fire insurance policy's "'errors and omissions' clause", that "such a standard clause does not permit an insured to obtain insurance coverage for an uncovered loss that has already occurred." *Id*. at 1128. Such an approach is plainly consistent with and supported by the general principle of Texas law that risk is an essential element of an insurance contract, meaning that insurers insure against future losses whose probability of occurrence is less than one hundred percent. 45 Tex. Jur. 3d, Insurance Contracts and Coverage §§ 18-19 (citing Texas cases). Where, as here, on the other hand, the

_____

misdescription of otherwise insured property. What the Errors and Omissions clause would not do, the district court stated, is rescue Conagra if it had indeed deliberately omitted a property from the insurance schedule. *Id*. at 761-62. Thus, to the extent that *Conagra* applies at all to the instant case, it is to suggest that, as here, a deliberate, though mistaken, choice not to cover certain property will not be remedied by an Errors and Omissions clause.

St. Paul Fire & Marine Ins. Co. v. Gen. Mut. Ins. Co.*, 213 So. 2d 856 (Ala. 1968), is distinguishable insofar as it concerned a failure to renew an existing policy and was decided under an Errors and Omissions clause that expressly contemplated an unintentional failure to renew. In the instant case, on the other hand, Wentwood did not inadvertently fail to renew existing coverage. Graoch failed altogether to insure the Woodside Village against flood damage when it purchased the excess policy from Royal.

14

insured knows that the loss has already been sustained, the element of risk is absent.  Given that all parties were always aware that Woodside Village was *not* exempted from the Royal policy's Flood Peril exclusion, and given the "insurance provided hereunder" language of the primary policy's Errors and Omissions clause and the "in respect of the perils hereby insured against" and "except as otherwise provided herein" language of the Royal excess policy, this case is a particularly appropriate one for application of the rule stated in *Simon*.

The district court correctly denied Wentwood recovery on the Royal policy.[5]

### B.   Denial of leave to file Second Amended Complaint against Royal

Wentwood contends that the district court erred in failing to allow a second amended complaint which would have added a claim against Royal over a month after summary judgment had been granted to Royal.  Wentwood's proposed second amended complaint alleges for the first time a claim of negligence against Royal, asserting that Lockton was Royal's agent, that Lockton was negligent in failing to have Woodside Village listed as an exception to the Flood Peril exclusion in the Royal policy and that Royal is responsible for Lockton's negligence under the

---

[5] The failure of Wentwood's breach of contract claim is fatal to its extra-contractual claims against Royal.  Wentwood does not contend otherwise.

15

doctrine of respondeat superior. The proposed amended complaint does not seek to add Lockton as a defendant. Wentwood admitted that it was its understanding, well before its first amended complaint was filed in November 2002, that Lockton was Royal's agent, and it does not assert that it thereafter discovered new facts relevant to the new respondeat superior claim. However, Wentwood maintains that it could not have asserted this claim in its first amended complaint because such claim did not become "ripe" until the magistrate judge concluded as a matter of law that no insurance coverage existed.

### i.   Standard of Review

Denial of leave to amend a complaint under FED. R. CIV. P. 15(a) is reviewed for an abuse of discretion. *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004).

### ii.   Discussion

This case was removed on August 13, 2002, and assigned to the magistrate judge on September 19, 2002. On October 24, 2002, the magistrate judge issued a scheduling order setting May 19, 2003 as the deadline for amending pleadings. Wentwood filed its first amended complaint on November 26, 2002. The premise behind this complaint was that Royal's excess policy, through the primary policy's incorporated Errors and Omissions clause, covered the Woodside Village. Wentwood did not plead in the alternative, as it is entitled to do under FED. R. CIV. P.

16

8(e)(2), that Royal was vicariously liable to it for the negligence of its alleged agent, Lockton, in failing to secure coverage at all. Wentwood, in other words, could have, but deliberately chose not to, assert in its November 2002 first amended complaint an alternative vicarious liability claim against Royal.

On December 18, 2002, Wentwood filed its motion for summary judgment against Royal. Royal responded with a cross-motion for summary judgment on January 7, 2003. On September 12, 2003, the magistrate judge granted summary judgment for Royal and denied the same to Wentwood. On October 7, 2003, the reference to the magistrate judge was vacated and the case returned to the presiding district judge. On November 12, 2003, two months after summary judgment had been granted to Royal, Wentwood filed a motion for reconsideration of the magistrate judge's summary judgment order. On that same day, Wentwood also sought leave to file a second amended complaint alleging the cause of action against Royal for vicarious liability. The district court denied both motions in a short order explaining that there was no basis permitting a new complaint because Wentwood was simply offering a new theory of recovery against Royal.

Wentwood's appeal on this score is plainly not well taken. Wentwood could have, but did not, plead its cause of action

against Royal in the alternative,[6] and it was therefore hardly an abuse of discretion for the district court to deny Wentwood a post-summary judgment opportunity to present its claims against Royal. *Freeman v. Continental Gin Co.*, 381 F.2d 459, 470 (5th Cir. 1967) ("We hold that a district court does not abuse its discretion in refusing to allow amendment of pleadings to change the theory of a case if the amendment is offered after summary judgment has been granted against the party, and no valid reason is shown for failure to present the new theory at an earlier time."); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003) ("'A busy district court need not allow itself to be imposed upon by the presentation of theories *seriatim*.'") (quoting *Freeman*); *Briddle v. Scott*, 63 F.3d 364, 380 (5th Cir. 1995) (same). There was no abuse of discretion in the denial of Wentwood's belated motion to file its second amended complaint.

## III.

### GMAC

On appeal, Wentwood pursues only two theories of recovery against GMAC. First, Wentwood contends that GMAC assumed a common law duty to notify it when a revision to FEMA's flood maps placed the Woodside Village in an SFHA. Second, Wentwood argues

---

[6] Indeed, its proposed second amended complaint did just that.

18

that GMAC's failure to discharge an alleged statutory duty under the National Flood Insurance Act, 42 U.S.C. § 4001 *et seq.*, gave rise to a cause of action under Texas law for negligence *per se*.

**A.  Standard of Review**

*See supra* § II(A)(i).

**B.  Discussion**

### i.  Assumed Duty to Notify

Wentwood does not dispute that it breached its own contractual duty under the deed of trust to secure the coverage for the Woodside Village required by the terms of the deed of trust.  It argues that its own failure is not relevant to GMAC's concurrent failure to discharge the duty it allegedly assumed to notify Wentwood of changes to FEMA's flood maps.

In particular, Wentwood contends that GMAC is liable to it under section 323 of the Restatement (Second) of Torts, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if:
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

*See, e.g., Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 120

19

(Tex. 1976) (affirming Texas' adoption of section 323); *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 838 (Tex. 2000) (same). Wentwood contends that GMAC assumed a duty to it when, in September 2000, it sent separate letters to Wentwood Hartford and to Wentwood St. James notifying those two partnerships that their properties were affected as a result of the April 2000 changes to the Houston-area FEMA maps.

This contention is not, however, consistent with the plain language of section 323. That section clearly states that where one "undertakes . . . to render services *to another* which he should recognize as necessary for the protection of *the other's* . . . things" he may be "subject to liability *to the other*" (emphasis added). Plainly, *the only* potential liability addressed is liability to the party the defendant undertook to render services to. Yet it is undisputed in this case that GMAC *did not* render or undertake any notification services to Wentwood. *Torrington*, 46 S.W.3d at 837 ("Texas law generally imposes no duty to take action to prevent harm to others absent special relationships or circumstances."); *Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 396 (Tex. 1991); Restatement (Second) of Torts § 314. GMAC only notified the affiliated but nevertheless legally separate and distinct independent partnerships, Wentwood Hartford and Wentwood St. James. Indeed, the letters GMAC sent were addressed specifically

20

to these two partnerships.[7]  The only grantor and the only debtor in the deed of trust is Wentwood Woodside I, L.P.  The only property covered by the deed of trust is Woodside Village.  The only indebtedness secured thereby is the $5,950,000 debt for the Woodside Village acquisition.  The deed of trust does not mention any other indebtedness, nor any property other than Woodside Village, nor does it mention Wentwood Hartford or Wentwood St. James or give any indication that Wentwood Woodside I, L.P., is a party of any affiliated group of entities; neither Wentwood Hartford nor Wentwood St. James has any interest in Woodside Village (so far as this record shows) or any liability on the indebtedness secured by the deed of trust thereon; nor (so far as this record shows) does Wentwood Westside have any interest in any of the properties owned by Wentwood Hartford or by Wentwood St. James or any liability on any indebtedness secured by any such property.  GMAC's notification to Wentwood Hartford concerning its property and to Wentwood St. James concerning its property does not constitute GMAC's having undertaken the

---

[7] Wentwood implies in its brief that GMAC's letters were sent to Pinnacle, not Wentwood Hartford and Wentwood St. James. Wentwood considers this significant because, in sending letters to Pinnacle about two properties in Houston owned by affiliated partnerships, GMAC was obligated to notify Pinnacle about all of the Houston properties owned by any affiliated partnership that were affected by the FEMA map changes.  GMAC sent two letters addressed specifically to Wentwood Hartford and Wentwood St. James, respectively.  These letters were sent in care of Pinnacle at Pinnacle's address in Tacoma, but this does not negate that the letters were addressed to two specific recipients.  The deed of trust does not mention Pinnacle or any address in Tacoma.

21

rendition of any services to Wentwood Woodside. *Cf. Turlington* at 839 ("a person's duty [under § 323] to exercise reasonable care in performing a voluntarily assumed undertaking is limited to that undertaking") (inside quotation marks and citation omitted).[8]  Thus, the law Wentwood cites is unavailing on its face.

Wentwood tries to salvage its section 323 claim against GMAC by recasting it as a section 324A claim, arguing that Wentwood is somehow a third-party injured by GMAC's correspondence sent to Wentwood Hartford and Wentwood St. James.[9]  Wentwood cites

---

[8] We also note that there is no basis for concluding that GMAC should have realized that notification of Wentwood Westside was "necessary for the protection of" Wentwood Westside's property, namely Woodside Village.  Under the deed of trust, it was plainly the obligation of Wentwood Westside to be so informed.  The information had been publically knowable since April 2000, and published in the Federal Register since September 2000, the latter date being over two months before the Royal policy was issued and over six months before the flooding, and was never uniquely available to GMAC.  Moreover, there is no indication that GMAC had ever informed Wentwood Woodside that Woodside Village (or any other property of Wentwood Woodside) was (or was not) within an SFHA or that GMAC would keep track of that for Wentwood Woodside.  Finally, although in September 2000 GMAC did inform Wentwood Hartford that its property, and Wentwood St James that its property, was in an SFHA, only one of those two separate properties was listed as an exception to the Flood Peril exclusion in the November 2000 Royal policy.

[9] Section 324A reads:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his

22

*Brownsville Navigation District v. Izaguirre*, 800 S.W.2d 244

(Tex. App. – Corpus Christi, 1990) *rev'd in other respects,* 829

S.W.2d 159 (Tex. 1992), for the proposition that GMAC is liable

under section 324A. *Brownsville*, however, is completely

inapposite. In that case, the defendant, a railroad and its

truck line, treated by the court collectively as one entity,

furnished a trailer to a trucking company to pick up some large

steel coils at a warehouse and return them to the railroad for

further shipment. The defendant furnished the warehouse with

instructions on how the coils were to be loaded and tied down in

the trailer; the instructions, however, were affirmatively unsafe

and contrary to applicable federal regulations. In loading the

coils, warehouse employees followed the faulty instructions the

defendant negligently gave the warehouse for that purpose, and as

a result, the plaintiff, one of the warehouse employees loading

---

> failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

Restatement (Second) of Torts § 324A.

23

the coils, was injured.  The *Browsville* court held that this was a valid basis on which to hold the defendant liable.

*Browsville* has no relevance to the instant case.  Here there is no evidence that GMAC was negligent with respect to either Wentwood Hartford or Wentwood St. James, nor did it undertake to perform any services to them which it did not perform.[10]  Again, as previously explained, GMAC's notification to Wentwood Hartford, and its notification to Wentwood St. James, do not constitute GMAC's having undertaken the rendition of the service of notification to Wentwood Westside concerning Woodside Village. *See also* note 8 *supra* and accompanying text.

There is no summary judgment evidence sufficient to support a judgment that GMAC breached a common law duty to Wentwood.

### ii.  Negligence *per se*

Wentwood contends that GMAC was negligent *per se* under Texas law when GMAC failed to notify Wentwood that the Woodside Village fell within a revised FEMA SFHA map because this failure was allegedly a violation of a federal statutory duty imposed on GMAC.  Wentwood locates this duty in a provision of the National Flood Insurance Program, 42 U.S.C. § 4011 *et seq*.  Wentwood directs our attention in particular to the following language:

"**§ 4012a.  Flood insurance purchase and**

_____

[10]  Wentwood's other case, *Rudolph v. ABC Pest Control, Inc.*, 763 S.W.2d 930 (Tex. App. – San Antonio 1989, writ denied), is similarly distinguishable.

24

**compliance requirements and escrow accounts**
***
**(b) Requirement for mortgage loans.**

(1) **Regulated lending institutions**

Each Federal entity for lending regulation (after consultation and coordination with the Financial Institutions Examination Council established under the Federal Financial Institutions Examination Council Act of 1974) [12 U.S.C. § 3301 et seq.] shall by regulation direct regulated lending institutions not to make, increase, extend, or renew any loan secured by improved real estate or a mobile home located or to be located in an area that has been identified by the Director as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968 [42 U.S.C. § 4001 et seq.], unless the building or mobile home and any personal property securing such loan is covered for the term of the loan by flood insurance in an amount at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the Act with respect to the particular type of property, whichever is less.
***
**(e) Placement of flood insurance by lender.**

(1) **Notification to borrower of lack of coverage**

If, at the time of origination or at any time during the term of a loan secured by improved real estate or by a mobile home located in an area that has been identified by the Director (at the time of the origination of the loan or at any time during the term of the loan) as an area having special flood hazards and in which flood insurance is available under the National Flood Insurance Act of 1968 [42 U.S.C. § 4001 et seq.], the lender or servicer for the loan determines that the building or mobile home and any personal property securing the loan is not covered by flood insurance or is

covered by such insurance in an amount less than the amount required for the property pursuant to paragraph (1), (2), or (3) of subsection (b) of this section, the lender or servicer shall notify the borrower under the loan that the borrower should obtain, at the borrower's expense, an amount of flood insurance for the building or mobile home and such personal property that is not less than the amount under subsection (b)(1) of this section, for the term of the loan.

(2) **Purchase of coverage on behalf of borrower**

If the borrower fails to purchase such flood insurance within 45 days after notification under paragraph (1), the lender or servicer for the loan shall purchase the insurance on behalf of the borrower and may charge the borrower for the cost of premiums and fees incurred by the lender or servicer for the loan in purchasing the insurance.

*** 

(4) **Applicability**

This subsection shall apply to all loans outstanding on or after September 23, 1994."

That statute does not apply to this case. The plain language of section 4012a establishes that it applies only to "regulated lending institutions" that are regulated in the sense that they are subject to the oversight of a "Federal entity for lending regulation[.]" *Barnhart v. Sigmon Coal Co.*, 122 S. Ct. 941, 950 (2002) ("As in all statutory construction cases, we begin with the language of the statute."). Wentwood does not dispute that GMAC is not the lender in this case. Wentwood also does not dispute that neither Column Financial nor the REMIC is a federally regulated lender. Wentwood tries to bring this case within the ambit of section 4012a solely by observing that

26

LaSalle Bank, which presumably is a federally regulated lending institution, holds the mortgages in the REMIC as trustee. LaSalle's status as trustee is irrelevant, however, because being a trustee does not constitute LaSalle as having any equity interest or investment in the loans and does not make LaSalle responsible for the loans in the event of default. Section 4012a is concerned with the risk to the public treasury created by federally backed or regulated loans for real property that are not protected by adequate flood insurance. *Till v. Unifirst Fed. Sav. & Loan Ass'n*, 653 F.2d 152, 159 (5th Cir. 1981) ("Congress was interested [in enacting section 4012a] in protecting the lending institutions whose deposits the federal regulatory agencies insured.").[11]

---

[11] Furthermore, even if we assume that the statute applies, it is by no means clear that section 4012a imposes an affirmative duty on servicers to audit the mortgages they service to ensure that they are adequately insured. The statute provides in relevant part that "*If*,...at any time during the term of a loan[,]...the servicer for the loan determines that the [SFHA property] is not covered by flood insurance...the servicer shall notify the borrower [of this deficiency.]" 42 U.S.C. § 4012a(e)(1) (emphasis added). Significantly, the statute does not *require* a servicer to *know* that a serviced property has been designated as being within an SFHA. Rather, the statute creates a duty of notification only *if* the servicer learns that the serviced property falls within an SFHA. By using the conditional "if," the statute implicitly contemplates that there will be circumstances in which a servicer *does not* determine that an under-insured SFHA property is in fact under-insured. Therefore, contrary to Wentwood's position, the statute cannot be read to impose an *unconditional* duty on servicers to determine whether their serviced properties are adequately insured against flood damage.

27

In any case, even if we assume that GMAC is subject to the statute and that it had an affirmative duty of notification, Wentwood still cannot prevail under Texas law. "The threshold questions in every negligence per se case are whether the plaintiff belongs to the class that the statute was intended to protect and whether the plaintiff's injury is of a type that the statute was designed to prevent." *Perry v. S.N.*, 973 S.W.2d 301, 305 (Tex. 1998). Neither the Texas Supreme Court, nor indeed any of the courts of Texas, has ever considered whether a plaintiff like Wentwood belongs to the class that section 4012a protects. We must, therefore, make an *Erie* "guess" about how the Texas Supreme Court would answer this question. *See, e.g., Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 564-65 (5th Cir. 2003).

In making such a "guess," we begin where we believe the Texas Supreme Court would begin; namely, with the decisions of the federal courts in general and this court in particular. Every single federal court to consider whether a federal private right of action arises under section 4012a has concluded that the federal treasury, not individual mortgagors like Wentwood, is the class the statute intends to protect. *See, e.g., Till*, 653 F.2d at 159-61; *Hofbauer v. Northwestern Nat'l Bank*, 700 F.2d 1197, 1201 (8th Cir. 1983); *Arvai v. First Fed. Sav. & Loan* Ass'n, 698 F.2d 683, 684 (4th Cir. 1983); *Mid-America Nat'l Bank of Chicago*

28

*v. First Sav. & Loan Ass'n of South Holland*, 737 F.2d 638, 642 (7th Cir.) *cert. denied* 105 S. Ct. 911 (1984). In our view, the Texas Supreme Court would construe 42 U.S.C. § 4012a in a manner consistent with the unanimous conclusion of the federal judiciary. Therefore, having "guessed" that the Texas Supreme Court would not treat mortgagors as the protected class, we hold that section 4012a does not give rise to a private right of action under Texas law for negligence *per se*.

No error has been shown in the district court's grant of summary judgment in favor of GMAC.

### Conclusion

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

29