**ARM PROPERTIES MANAGEMENT GROUP, Plaintiff,**

v.

**RSUI INDEMNITY COMPANY, Defendant.**

**Case No. A-07-CA-718-SS.**

United States District Court, W.D. Texas, Austin Division.

March 4, 2009.

Alan M. Cohen, Lee H. Shidlofsky, Visser Shidlofsky, Brandon Duane Gleason, Eva C. Ramos, J. Hampton Skelton, Skelton & Woody, Austin, TX, for Plaintiff.

Bradford K. Burdette, James Richard Harmon, Robert O. Lamb, Thompson Coe Cousins and Irons LLP, Dallas, TX, for Defendant.

### ORDER IN SUBSTITUTION FOR ORDER OF FEBRUARY 23, 2009

SAM SPARKS, District Judge.

BE IT REMEMBERED on the 23rd day of February, 2009 the Court entered an order [# 149]. That order is hereby withdrawn, and the present order is entered in substitution for it.

On this the *4th* day of March 2009, the Court reviewed the file in the above-styled cause, specifically Defendant RSUI Indemnity Company ("RSUI")'s Motion for Partial Summary Judgment on Flood Exclusion [# 52] and its appendix [# 53], Plaintiff ARM Properties Management Group ("ARM")'s unopposed motion for extension of time to file [# 71] and response thereto [# 77], RSUI's reply thereto [# 87], ARM's motion to strike the appendix [# 80]; RSUI's Motion for Partial Summary Judgment on NFIP Coverage [# 54] and its appendix [# 55], ARM's response thereto [# 75], and RSUI's reply thereto [# 86]; and RSUI's motion to strike evidence in support of ARM's response to the motion for summary judgment [# 89], ARM's response thereto [# 95], and RSUI's reply thereto [# 102]; ARM's unopposed motion to file sur-reply to RSUI's motions for summary judgment [# 90] and ARM's sur-reply [# 97]; RSUI's unopposed motion for leave to file a rebuttal to ARM's surreply [# 94] and RSUI's rebuttal [# 99]; RSUI's unopposed motion for leave to file a supplement to its rebuttal of ARM's sur-reply [# 101]; ARM's unopposed motion for leave to file a supplemental response to RSUF s motion on flood exclusion [# 126]; RSUI's Motion for Leave to File Defendant's Motion for Summary Judgement [# 113], and ARM's response thereto [# 124]; and ARM's Post–Submission Brief [# 129] and RSUI's response thereto [# 135].

In the interest of developing the record as fully as possible, the Court GRANTS ARM's unopposed motion for extension of time to file [# 71], ARM's unopposed motion to file sur-reply to RSUI's motions for summary judgment [# 90], RSUI's unopposed motion for leave to file a rebuttal to ARM's sur-reply [# 94], RSUI's unopposed motion for leave to file a supplement to its rebuttal of ARM's sur-reply [# 101], ARM's unopposed motion for leave to file a supplemental response to RSUI's motion on flood exclusion [# 126], and RSUI's Motion for Leave to File a Motion for Summary Judgment [# 113]. In the same vein, the Court DENIES RSUI's motion to strike ARM's response in opposition to RSUI's motion for summary judgment [# 146]. Having considered the motions, responses, the replies, the relevant law, and the case file as a whole, the Court enters the following opinion and order, considering RSUI's motions for partial summary judgment in turn.

### APPLICABLE LEGAL STANDARDS

### I. Summary Judgment Standard

Summary judgment may be granted if the moving party—in this case, RSUI—shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding summary judgment, the Court construes all facts and inferences in the light most favorable to the nonmoving party. *Richter v. Merchs. Fast Motor Lines,*

*Inc.*, 83 F.3d 96, 98 (5th Cir.1996). The standard for determining whether to grant summary judgment "is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the nonmoving party based upon the record evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir.1990).

Both parties bear burdens of production in the summary judgment process. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party has the initial burden of showing there is no genuine issue of any material fact and judgment should be entered as a matter of law. FED. R. CIV. P. 56(c); *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party must then come forward with competent evidentiary materials establishing a genuine fact issue for trial, and may not rest upon mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Neither "conclusory allegations" nor "unsubstantiated assertions" will satisfy the non-movant's burden. *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

## II. Interpretation of an Insurance Policy under Texas Law

When interpreting an insurance policy, a court applies the same rules for interpreting other types of contracts, reading all parts of the policy together and exercising caution not to isolate particular sections or provisions from the contract as a whole. *Provident Life & Accident Co. v. Knott*, 128 S.W.3d 211, 216 (Tex.2003) (citations omitted). In other words, the court must give effect to all contractual provisions of the policy so that none are rendered meaningless. *See id.; Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). However, "[n]o one phrase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions." *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 626 (5th Cir.1998) (quoting *Forbau*, 876 S.W.2d at 134). The parties' intent "is governed by what they said, not by what they intended to say but did not." *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex.2006).

Whether an insurance contract is ambiguous is a question of law. *American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex.2003). If policy language can be given a definite or certain legal meaning, the policy contract is not ambiguous and the court may construe it as a matter of law. *Id.* That the parties disagree with the policy's interpretation, or the result, is irrelevant, as "[d]isagreement over the meaning or interpretation of a term is not sufficient to make a provision ambiguous or create a question of fact." *Lynch Props., Inc.*, 140 F.3d at 626. Neither will a party's "reasonable expectations" create ambiguity under Texas law. *See Constitution State Ins. Co. v. Iso-Tex Inc.*, 61 F.3d 405, 410 (5th Cir.1995); *Forbau*, 876 S.W.2d at 134 ("[N]either conflicting expectations nor disputation is sufficient to create an ambiguity."). Instead, "[a]n ambiguity exists only if the contract language is susceptible to two or more reasonable interpretations." *American Mfrs. Mut. Ins. Co.*, 124 S.W.3d at 157.

## MOTION FOR PARTIAL SUMMARY JUDGMENT ON FLOOD EXCLUSION

### I. Background

#### (a) Factual Background

Plaintiff ARM, a Texas partnership, purchased multiple "layers" of insurance for

nine properties in Mississippi that were subsequently damaged by Hurricane Katrina. The primary insurance policy was issued by Westchester Surplus Lines Insurance Company ("Westchester"). The Westchester policy limit was $20,000,000. The first-layer excess policy was issued by Essex Insurance Company ("Essex") and was limited to $10,000,000. The second-layer excess policy (the "RSUI policy") was issued by RSUI, the Defendant, with a limit of $470,000,000 per occurrence.

The nine properties insured under these interlocking policies were each heavily damaged by Hurricane Katrina on August 29, 2005. It is undisputed that Westchester and Essex have paid ARM the full limits of the primary and first-layer insurance policies as a result of this occurrence. ARM now seeks to recover its excess losses from the RSUI policy. RSUI however, seeks in the present motion for partial summary judgment to establish "that any property damage, business interruption losses, or extra expenditures resulting from flood waters, *concurrently or in any sequence,* are excluded from coverage." RSUI Mot. Summ. J. on Flood Exclusion ("RSUI Mot.") [# 52/53] at ¶ 4 (emphasis added). In other words, RSUI claims the RSUI policy not only excludes coverage for flood damages, but for all losses caused by a combination of another force, such as wind, and flood waters.

### (b) Language of the Policies at Issue

#### (1) The RSUI Policy's Adoption of the Terms of the Westchester Policy

It is undisputed the RSUI policy expressly excludes coverage for "flood" damage. *See* ARM's Resp. [# 77] at 5. Furthermore, except as it provides otherwise, the RSUI policy in large part adopts the provisions of the Westchester Policy. Specifically, the RSUI policy provides in its Insuring Clause (found in the "Excess Physical Damage Coverage Form"):

1. INSURING CLAUSE:

Subject to any limitations, terms, and conditions contained in this Policy or added hereto, the Company agrees to indemnify the Insured named in the schedule herein in respect of direct physical loss or damage to the property described in the schedule while located or contained as described in the schedule, occurring during the period stated in the schedule and caused by *any such perils as set forth in Item 3 of the Schedule,*[1] and which are also covered by and defined *in the policy(ies) specified in the schedule and issued by the "Primary Insurer(s)"* stated therein.[2]

RSUI Mot. at Ex. 3, RWUI UWR 8 (emphasis added). Thus, the Insuring Clause specifically allows coverage for all perils set forth in the Schedule—i.e., "all risk excluding flood or earthquake"—which are also covered by and defined in the Westchester policy.

The RSUI policy also provides in its Maintenance of Primary Insurance Clause (found in the "Excess Physical Damage Coverage Form"):

5. MAINTENANCE OF PRIMARY INSURANCE:

*In respect of the perils hereby insured against, this Policy is subject to the*

---

**1.** The "perils set forth in Item 3 of the Schedule" are all risks excluding flood and earthquake. The reference is to the RSUI policy's "Excess Physical Damage Schedule," which provides: "Perils Covered: All Risk Excluding Flood and Earthquake."

**2.** The "policy[ ] specified in the schedule and issued by the 'Primary Insurer[ ]'" refers to the Westchester policy. "[T]he schedule" is the previously mentioned Excess Physical Damage Schedule, under which the "Primary Insurer" is listed as "Westchester Surplus Lines, Insurance Company, Policy # D35899741 002[.]" *Id.*

*same warranties, terms and conditions* (except as regards the premium, the amount and limits of liability other than the deductible or self-insurance provision where applicable, and the renewal agreement, if any; and EXCEPT AS OTHERWISE PROVIDED HEREIN) *as are contained in or as may be added to the policy(ies) of the primary insurer(s) prior to the happening of a loss* for which claim is made hereunder, and should any alteration be made in the premium for the policy(ies) of the primary insurer(s), then the premium hereon shall be adjusted accordingly.

RSUI Mot. at Ex. 3, RSUI UWR 8 (emphasis added). Again, the "perils hereby insured against" are defined in the policy's Schedule as "all risk excluding flood and earthquake," *see id.* at Ex. 3, RSUI UWR 7, and the "policy(ies) of the primary insurer(s)" refers to the Westchester policy.[3] Therefore, this clause effectively adopts the terms of the Westchester policy with respect to those perils also insured in the RSUI policy. In sum, "EXCEPT AS OTHERWISE PROVIDED" elsewhere in the RSUI policy, the perils insured against in that policy ("All Risk[s] Excluding Flood and Earthquake") are "subject to the same warranties, terms, and conditions . . . as are contained in or as may be added to the [Westchester policy]."

*(2) The Westchester Policy's Coverage*

The Westchester policy also excludes flood damage, stating in its "Causes of Loss—Special Form:"

**B. Exclusions**

1. We will not pay for loss or damage caused directly or indirectly by any of the following. *Such loss or damage is excluded regardless of any other cause*

*or event that contributes concurrently or in any sequence to the loss.*

. . . g. **Water**

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not[.]

*Id.* at Ex. 1, RSUI UWR 427 (emphasis added). The emphasized portion of the Westchester policy quoted above is what is often referred to by insurers as an anti-concurrent causation ("ACC") clause. An ACC clause, by its terms, excludes coverage for damage caused by the combination of an excluded loss, such as flood damage, and a covered loss, such as wind damage, regardless of whether the covered loss contributed "concurrently or in any sequence" to the excluded loss. For instance, a similar ACC clause was read to "preclude coverage for all damages except those caused exclusively by wind, so that if wind and flood synergistically cause the same damages, such damages are excluded." *See, e.g. Leonard v. Nationwide Mut. Ins. Co.*, 499 F.3d 419, 430 (5th Cir. 2007).

Because the Westchester policy includes an ACC clause, RSUI argues the flood exclusion in the RSUI policy should also be read to include an ACC clause, based on the language of the Westchester policy, which the RSUI policy in large part adopts. ARM contends, however, that the ACC clause in the Westchester policy is modified by a "Flood Coverage Endorsement" that is attached to the Westchester policy. The Flood Coverage Endorsement reads as follows:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

3. In the previously mentioned Excess Physical Damage Schedule, the "Primary Insurer" specifically is listed as "Westchester Surplus Lines, Insurance Company, Policy # D35899741 002" (the Westchester policy). *Id.*

**FLOOD COVERAGE ENDORSE-MENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

* * * *

B. This endorsement applies to the Covered Property and Coverages for which a Flood Limit of Insurance is shown in the Flood Coverage Schedule or in the Declarations.

C. **Additional Covered Cause of Loss**

The following is added to the Covered Causes Of Loss:

Flood, meaning a general and temporary condition of partial or complete inundation of normally dry land areas due to:

1. The overflow of inland or tidal waters;

2. The unusual or rapid accumulation or runoff of surface waters from any source; or

3. Mudslides or mudflows which are caused by flooding as defined in C.2. above. For the purpose of this Covered Cause of Loss, a mudslide or mudflow involves a river of liquid and flowing mud on the surface or normally dry land areas as when earth is carried by a current of water and deposited along the path of the current. All flooding in a continuous or protracted event will constitute a single flood.

D. **Exclusions, Limitations And Related Provisions**

1. The Exclusions and Limitation(s) sections of the Causes Of Loss Form (and the Exclusions section of the Mortgageholders Errors And Omissions Coverage Form and the Standard Property Policy) apply to coverage provided under this endorsement except as provided in D.2. and D.3. below.

2. *To the extent that a part of the Water Exclusion might conflict with coverage provided under this endorse-ment, that part of the Water Exclusion does not apply.*

* * * *

RSUI Mot. at Ex. 1, RSUI UWR 441 (emphasis added).

**II. Analysis**

Although ARM does not seek flood damages from RSUI, it does seek to hold RSUI liable for damages caused by a combination of winds and flooding, which application of the ACC clause would allegedly preclude. The parties have two overriding disputes with respect to the RSUI policy's adoption of the provisions of the Westchester policy, and, specifically, whether the RSUI policy did or did not adopt the Westchester policy's ACC clause. The first dispute centers around the meaning of the language "[i]n respect of the perils hereby insured against" in the RSUI policy's Maintenance of Primary Insurance Clause, and the second centers around the operation and effect of the Flood Coverage Endorsement in the Westchester policy.

With regard to the provisions of the RSUI policy at issue in the present motion for partial summary judgment, neither of the parties argue there is any ambiguity present. The Court agrees, and finds the provisions are unambiguous and susceptible to only one reasonable interpretation, and thus should be construed by the Court as a matter of law.

*(a) RSUI's Adoption of the Terms of the Westchester Policy*

First, ARM points out that while the RSUI policy does "in large part" follow form to the Westchester policy, the RSUI policy only does so "[i]n respect of the perils . . . insured against" in the RSUI policy. *See* RSUI Mot. at Ex. 3, RSUI UWR 8 (Insuring Clause and Maintenance of Primary Insurance Clause). Because

flood is undisputedly not a peril insured against in the RSUI policy, ARM contends the RSUI policy does not adopt the terms and conditions of the Westchester policy with respect to flood. Pl.'s Supp. Resp. [# 126] at 1–2.

RSUI agrees with ARM that the RSUI policy "only incorporates the terms of the underlying [Westchester] primary policy '[i]n respect of perils hereby insured against.' " Def.'s Supp. to Rebuttal [# 101] at ¶ 3. RSUI also agrees that the RSUI policy excludes coverage for flood, which means flood is *not* a "peril[ ] hereby insured against." *Id.* However, from this same language and its undisputed meaning RSUI draws the conclusion the RSUI policy simply does not adopt the Westchester policy's Flood Coverage Endorsement—because the Flood Coverage Endorsement relates to flood coverage—but *does* adopt the Water Exclusion and the ACC clause from the Westchester policy. *Id.* The Fifth Circuit has interpreted a "Maintenance of Primary Insurance" clause almost identical to the one in the RSUI policy. *See Wentwood Woodside I, LP v. GMAC Commercial Mortg. Corp.*, 419 F.3d 310 (5th Cir.2005). The provision considered by the Fifth Circuit in *Wentwood* read as follows:

> *In respect of the perils hereby insured against,* this Policy is subject to the same warranties, terms and conditions (except as regards the premium, the amount and limits of liability other than the deductible or self-insurance provision where applicable, and the renewal agreement, if any; and EXCEPT AS OTHERWISE PROVIDED HEREIN) as are contained in or as may be added to the policy/ies of the primary insurer(s) prior to the happening of a loss for which claim is made hereunder, and should any alteration be made in the premium for the policy/ies of the primary insurer(s), then the premium hereon shall be adjusted accordingly.

*Id.* at 315 (emphasis in original). The RSUI policy's Maintenance of Primary Insurance clause in the present case is, for all practical purposes, identical to the one in *Wentwood.*

The Fifth Circuit noted in *Wentwood* that "the Maintenance of Primary Insurance clause in [the] excess policy only incorporates the terms of the underlying [ ] primary policy '[i]n respect of perils hereby insured against.' " *Id.* The Fifth Circuit went on to find that because the excess policy did not include flood as a covered peril, "by the plain terms of the above-quoted language, the Errors and Omissions clause [a clause not expressly related to any of the covered perils in the excess policy] was *not* incorporated into the [excess] policy with respect to flood damage." *Id.* at 315–16 (emphasis added).

Like the Fifth Circuit did, this Court finds that the plain terms of the Maintenance of Primary Insurance clause in the RSUI policy indicate the RSUI policy follows form to the Westchester policy *only with regard to the perils covered in the RSUI policy,* or, in other words, with regard to all perils except for flood and earthquake. Thus, none of the Westchester policy's provisions regarding flood or earthquake coverage are adopted by the RSUI policy.

RSUI is therefore correct in its contention that the Westchester policy's Flood Coverage Endorsement is not adopted in the RSUI policy. However, RSUI overlooks the fact that neither is the ACC clause adopted by the RSUI policy. If the RSUI policy only adopts the terms and conditions of the Westchester policy with respect to the RSUI policy's covered risks, the RSUI policy by its plain language does not adopt the ACC clause, as the ACC clause does not relate to any risk covered by the RSUI policy, but instead to a risk

that is expressly excluded: water, or flood damage. In short, the Maintenance of Primary Insurance clause clearly directs that with respect to risks specifically excluded from the RSUI policy, its own terms—without reference to the terms of the Westchester policy—control, and the Court so finds.

### (b) Effect of the Flood Coverage Endorsement

Although the above finding fully settles the matter of whether the ACC clause is adopted by the RSUI policy (it is not), the Court will nevertheless address the merits of parties' alternative argument. ARM maintains, in the alternative to its previous argument, that the language of the ACC clause in the Westchester policy was "deleted, at least with respect to flood [coverage]" by the following language in the Flood Coverage Endorsement that is attached to the Westchester policy, such that "[t]o the extent that a part of the Water Exclusion [the section containing the ACC clause] might conflict with coverage provided under this endorsement, that part of the Water Exclusion does not apply." ARM's Resp. at 2. (citing RSUI Mot. at Ex. 1, RSUI UWR 441, the Westcher policy Flood Coverage Endorsement); ARM's Supp. Resp. at 3, n. 3.

RSUI, however, contends the Flood Coverage Endorsement does **not** delete the Water Exclusion and ACC clause in the Westchester policy, but merely suspends their application for a sub-limit of $7.5 million in flood coverage. RSUI's Reply at 1. This sub-limit for flood coverage is indicated in the "Flood Endorsement Declarations" in the Westchester policy, which provide two options for flood-coverage limits: "Option A—Full Limit" and "Option B—Reduced Limit." *See* RSUI Mot. at Ex. 1, RSUI UWR 386. ARM checked Option B, and thereby obtained a reduced flood sub-limit of $7.5 million. *Id.* Beyond that amount, RSUI

argues, the Flood Coverage Endorsement does not apply. RSUI goes on to argue that because the RSUI policy undisputedly excludes flood coverage, the Flood Coverage Endorsement from the Westchester policy (applicable only for the $7.5 million sub-limit of flood coverage) was not adopted in the RSUI policy. Instead, the RSUI policy adopts the Water Exclusion and ACC clause of the Westchester policy only, unchanged by the Flood Coverage Endorsement. RSUI's Resp. at ¶¶ 4–5.

RSUI's interpretation of the Westchester policy in this regard is the correct one. The Flood Coverage Endorsement to the Westchester policy, which adds $7.5 million in flood coverage, provides only that "To the extent that a part of the Water Exclusion might conflict with coverage provided under this endorsement, that part of the Water Exclusion does not apply." *See* RSUI Mot. at Ex. 1, RSUI UWR 386. By its plain, unambiguous language, it is clear the Flood Coverage Endorsement merely suspends the operation of the ACC clause (which is contained in the "Water Exclusion") insofar as the ACC clause might conflict with the Endorsement. After exhaustion of the flood sub-limit in the Westchester policy, flood damage is again excluded from the Westchester policy, and the Water Exclusion and ACC Clause once again come into effect. Because there is undisputedly no flood coverage in the RSUI policy, the terms of the Westchester policy's Endorsement, and specifically its suspension of the ACC clause, simply have no application to the RSUI policy.

However, in spite of this holding, the Court has already found—based on the language of the "Maintenance of Primary Insurance" provision in the RSUI policy— that the RSUI policy does not adopt **any** of Westchester policy's terms, conditions, or warranties with regard to flood coverage, as flood is not a peril covered in the

RSUI policy. Thus, neither the ACC clause nor the Flood Coverage Endorsement operate to change the terms of the RSUI policy.

In order to develop the record as fully as possible, the Court goes on to consider the alternative motions for summary judgment.

### MOTION FOR PARTIAL SUMMARY JUDGMENT ON NFIP COVERAGE

### I. Background

#### (a) Factual Background

As discussed in the previous motion for summary judgment, this case arises from ARM's purchase of multiple "layers" of insurance for nine properties in Mississippi that were subsequently damaged by Hurricane Katrina. The primary insurance policy was issued by Westchester, with a policy limit of $20,000,000; the first-layer excess policy was issued by Essex, with a policy limit of $10,000,000; and the second-layer excess policy was issued by RSUI, the Defendant, with a limit of $470,000,000 per occurrence.

The nine properties insured under these interlocking policies were all apartment complexes, which contained a total of 123 buildings at the time they were damaged. It is undisputed that 18 buildings [4] did not sustain any damages from flooding, but the rest of the buildings (105 in all) did sustain damage. ARM's Resp. [# 75] at ¶ 3. It is also undisputed that Westchester and Essex have paid ARM the full limits of the primary and first-layer insurance policies as a result of this occurrence.

RSUI seeks in this motion for partial summary judgment to establish that coverage under the RSUI policy is affected by a provision of the Westchester policy which states flood loss is covered under that policy only for the amount of loss in excess

of the "maximum limit that can be insured" under a National Flood Insurance Program ("NFIP") policy. Specifically, RSUI asks the Court to declare "the primary and underlying excess policies [the Westchester and Essex policies] are excess of the 'maximum limit that can be insured' under an NFIP policy, which is $250,000 per building[.]" RSUI Mot. Summ. J. on NFIP Coverage ("RSUI Mot.") [# 54/55] at 9. RSUI claims these provisions of the Westchester policy must be applied in calculating RSUI's liability under its own policy. RSUI's Resp. [# 86] at ¶ 4.

#### (b) Language of the Policies at Issue

##### (1) The RSUI Policy

It is undisputed the RSUI policy expressly excludes coverage for "flood" damage. See ARM's Resp. [# 77] at 5. Specifically, the RSUI policy covers the perils of "All Risk Excluding Flood and Earthquake." As discussed previously, the RSUI policy in its "Maintenance of Primary Insurance" clause in large part adopts the provisions of the Westchester Policy. See supra, section I(b)(1). The Maintenance of Primary Insurance clause in the RSUI policy essentially provides that except as otherwise provided, the policy's coverage "with respect of the perils hereby insured" is subject to the same warranties, terms, and conditions ... as are contained in or as may be added to the [Westchester policy]." RSUI Mot. at Ex. 3, RSUI UWR 8.

The RSUI policy also states that while it does not provide coverage for risks sublimited by any underlying policies, "the Insurers to [the RSUI policy] recognize that the primary and underlying excess policy limits can be eroded or exhausted, wholly or partially, by application of said

---

4. The 18 buildings undamaged by flood were located at the Lexington property (11 buildings) and the Royal Gulf property (7 buildings).

sublimits." RSUI Mot. at Ex. 3, RSUI UWR 7.

### (2) The Westchester Policy's Coverage

It is undisputed, as discussed previously, that the Westchester primary policy excludes flood coverage, but then by means of a "Flood Coverage Endorsement" provides for limited flood coverage of up "$7,500,000 per occurrence and annual aggregate." *Id.* at Ex. 1, RSUI UWR 386. But with respect to the $7.5 million sublimit for flood coverage in the Flood Coverage Endorsement, the policy calls for payment for flood loss only for the amount of loss *in excess of the maximum limit that can be insured* by a National Flood Insurance Program ("NFIP") policy, irrespective of whether there is actually an NFIP policy in place. *Id.* at Ex. 1, RSUI UWR 444. Specifically, the Flood Coverage Endorsement provides:

**I. Other Insurance**

The Other Insurance Commercial Property Conditions is replaced by the following with respect to the coverage provided under this endorsement:

1. If the loss is also covered under the National Flood Insurance Program (NFIP) policy, or if the property is eligible to be written under an NFIP policy but there is no such policy in effect, then we will pay only for the amount of loss in excess of the maximum limit that can be insured under that policy. This provision applies whether or not the maximum NFIP limit was obtained or maintained, and whether or not you can collect on the NFIP policy. We will not, under any circumstances, pay more than the applicable Limit of Insurance for Flood as stated in the

Flood Coverage Schedule or the Declarations of this Coverage Part.

*Id.* The Flood Coverage Endorsement does allow for a waiver of the above provision if the parties have so agreed, but provides that such a waiver applies *only if,* in relevant part, "the Flood Coverage Schedule or Declarations" indicate that the underlying NFIP insurance provision has been waived. *Id.* In the Flood Endorsement Declarations of the Westchester policy, there is a printed block under "Special Provisions" which allows for a waiver of the underlying NFIP insurance requirement. *See* RSUI Mot. at Ex. 1, RSUI UWR 387. However, the box indicating the waiver applies is *not checked.* Instead, there is an unchecked box, and the words next to it read "Underlying NFIP Insurance Waiver Applies to Locations: None." *Id.*

### (3) National Flood Insurance Program

It is undisputed the maximum limit that can be insured under an NFIP policy is $250,000 per building.[5] For properties containing multiple buildings, like apartment complexes, each building can obtain up to $250,000 of flood coverage. The NFIP Administrator publishes a list of "communities" eligible for NFIP coverage. *See id.* at Ex. A (44 C.F.R. § 64.6 as it appeared in 2005). ARM does not dispute that all the buildings in the nine properties insured by the RSUI policy were eligible for NFIP coverage.

### (c) Contentions of the Parties

Based on the language in the Westchester policy, RSUI argues the "Other Insurance" provision in the Flood Coverage Endorsement of the Westchester policy must be taken into account in calculating

---

5. The Code of Federal Regulations control the NFIP. *See id.* at Ex. A (44 C.F.R. § 61.4 as it appeared in 2005).

RSUI's liability under the RSUI policy. RSUI's Resp. at ¶ 3. Although RSUI admits its own policy does not cover flood damage, it argues the RSUI policy allows underlying limits to be eroded or exhausted by payments made for flood, as the policy's Excess Physical Damage Coverage Form provides:

4. **Application for Recoveries:**

. . . .

There is no recovery under this excess policy as respects those coverages which are sublimited within the [Westchester policy] ... however, *the Insurers to this excess policy recognize that the [Westchester] policy limits can be eroded or exhausted, wholly or partially, by application of said sublimits.*

RSUI Mot. at Ex. 3, RSUI UWR 8 (emphasis added). Thus, RSUI contends it is only liable to ARM for the amount of loss in excess of the maximum limit that can be insured under an NFIP policy—$250,000 per building—plus the underlying insurers' limits of $30 million.

In response, ARM argues RSUI is unilaterally trying to increase its attachment point rather than disputing which losses are covered by the RSUI policy. The RSUI policy does not have flood coverage at all, but only requires payment by the primary and underlying insurers for the policy to attach. ARM argues this issue has already been litigated, as this Court decided in a previous order (the "August 22nd Order" [# 41] ), in relevant part, that RSUI's liability under the RSUI policy has attached as a matter of law based on the underlying insurers' payment of their policy limits, and RSUI has no right to evaluate the propriety of the underlying insurers' payments to avoid liability under its own policy.

Secondly, ARM points to the undisputed fact that neither Westchester nor Essex (the primary and first-layer insurers, who actually insured for flood damage, unlike RSUI) applied an NFIP deductible; instead, both paid the full limits of their respective flood policies. If Westchester or Essex *had* applied an NFIP deductible, neither would have been liable for the limits of their flood policies. ARM argues this is because no NFIP deductible was intended; the fact the box indicating a waiver remained unchecked, therefore, was a mistake.

In the alternative, ARM argues the Westchester policy is ambiguous on this point, and should be construed against the insurer, RSUI. In the applicable section of the Flood Endorsement Declarations, the box beside the provision for "Underlying NFIP Insurance Waiver Applies to Locations" was left unchecked; however, the word "NONE" was also added to the end of the phrase, so that it reads "Underlying NFIP Insurance Waiver Applies to Locations: NONE[.]" ARM argues the addition of the word "NONE" in addition with not checking the box is essentially a double-negative which obscures the drafter's intentions.

#### (d) Evidence Submitted

ARM attempts to submit a variety of evidence concerning the negotiations leading up to the making of the insurance contracts, the intents of the parties to the underlying insurance contracts, and the intent of the parties in entering into the RSUI policy. *See* ARM's Resp. [# 75]. RSUI, however, argues all of this evidence is inadmissible parole evidence. *See* RSUI Mot. to Strike Evidence [# 89].

### II. Analysis

#### (a) Admissibility of Extrinsic Evidence

As discussed previously, insurance policies in Texas are construed according to the ordinary rules of contract construction. *Am. Mfrs. Mut. Ins. Co. v. Schaefer,*

124 S.W.3d 154, 157 (Tex.2003). It is well established that if a contract is unambiguous, construction of the contract is a matter of law, and extrinsic evidence of the intentions of the parties or of general practice or custom is not necessary or proper. *Nixon v. First State Bank of Corpus Christi,* 540 S.W.2d 817, 820–821 (Tex.Civ. App.-Corpus Christi 1976, ref. n.r.e.); *J.R. Gray Company v. Jacobs,* 362 S.W.2d 167, 171 (Tex.Civ.App.-Austin 1962, ref. n.r.e.). This doctrine, called the parol evidence rule, provides that in the absence of fraud, accident, or mistake, extrinsic evidence is not admissible to vary, add to, or contradict the terms of a written instrument that is facially complete and unambiguous. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 521 (Tex.1995).

Whether a policy's language is ambiguous is a question of law. *Schaefer,* 124 S.W.3d at 157. Ambiguity does not arise simply because the parties offer conflicting interpretations; rather, ambiguity exists only when the contract is susceptible of two or more reasonable interpretations. *Id.* Moreover, ambiguity must be evident from the policy itself; it cannot be created by introducing parol evidence of intent. *Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 747 (Tex.2006).

In the present case, ARM attempts to submit a variety of evidence of the circumstances surrounding the making of the insurance contracts, including the testimony of Robert Dennison, ARM's principal, and Nathan Burns, the wholesale insurance-broker, both of whom testify the Flood Endorsement Declaration was completed incorrectly and contrary to the intentions of the parties. *See* ARM's Resp. at Exs. 3–4. ARM also attempts to submit correspondence which took place after the loss occurred, between ARM's counsel, Essex, and Essex's counsel. *Id.* at Ex. 6. The reason for this is that the Essex policy also adopted portions of the Westchester policy, including flood coverage, and thus the question of whether NFIP coverage was intended to apply to the Essex policy is discussed in the correspondence. Finally, ARM also refers to the binder issued by Westchester prior to the issuance of its insurance policy, which makes no mention of an NFIP deductible, although according to Burns such information would have been included in the binder.

RSUI is correct in its contention that all of the above evidence is inadmissible parole evidence. It entirely concerns what the other insurance carriers did or did not do after the fact, what other information was available to RSUI at the time it entered into its policy (i.e., the binder from Westchester), and testimony as to the intentions of the parties entering into the policies. This Court simply cannot consider extrinsic evidence which is not part of the insurance policy to override the unambiguous language of the policy itself. The Court's primary concern is to give effect to the ***written expression*** of the parties' intent as contained in the policies themselves. *See Forbau,* 876 S.W.2d at 133. Therefore, RSUI's motion to strike is GRANTED.

### (b) Ambiguity of the NFIP Coverage Provision in the Westchester Policy

The Court addresses first ARM's argument that the Westchester policy is ambiguous with respect to NFIP coverage. The Court unequivocally finds it is not ambiguous. The Westchester policy is straightforward, allowing a waiver of NFIP coverage only if the parties have so agreed and ***only if*** in relevant part, "the Flood Coverage Schedule or Declarations" indicate that the underlying NFIP insurance provision has been waived. *Id.* In the Flood Endorsement Declarations of the Westchester policy, there is a printed

block under "Special Provisions" which allows for a waiver of the underlying NFIP insurance requirement, but the box indicating the waiver applies is not checked. *See* RSUI Mot. at Ex. 1, RSUI UWR 387. The words next to the box read "Underlying NFIP Insurance Waiver Applies to Locations: None." *Id.* If anything, the addition of the word "None" only underscores the fact that the waiver was not intended to apply to any of the covered locations. Either way, because the phrase is not checked, the clear, unambiguous meaning of the policy's language is that the NFIP coverage waiver does not apply to any of the covered properties.

### (c) Application of the NFIP Coverage Provision

RSUI claims the provision of the Westchester policy requiring NFIP coverage must be applied in calculating RSUI's liability under its own policy. Although RSUI admits its own policy does not cover flood damage, it argues application of the "underlying sublimits" must be considered in determining whether "the primary and underlying excess policy limits" were "eroded or exhausted." RSUI Mot. at Ex. 3, RSUI UWR 8. One such sublimit is the Westchester policy's NFIP provision, which undisputedly calls for payment for loss by flood "only for the amount in of loss in excess of the maximum limit that can be insured" by a policy issued under the NFIP program.

In its pleadings, RSUI argues alternatively (1) that the RSUI policy "adopted" the NFIP coverage provision, and therefore should be used in calculating coverage under the RSUI policy, *see* RSUI's Reply at ¶ 1; or (2) that—because each of the buildings insured by the RSUI policy were eligible for NFIP coverage—the NFIP provision of the Westchester policy should be "taken into account" in calculating the total amount of covered flood damages under "the [Westchester and Essex] excess

policies," and the Court should declare those underlying policies are in excess of the " 'maximum limit that can be insured' under an NFIP policy." RSUI's Mot. Summ. J. at ¶ 17. The Court is unconvinced by either argument.

■ First, pursuant to its reasoning in the first motion for summary judgment, *supra*, the Court finds the RSUI policy unambiguously does not "adopt" the NFIP provision. It is undisputed that the NFIP provision of the Westchester policy relates *only* to flood coverage, and it is also undisputed that the RSUI policy excludes flood coverage entirely. Therefore, the NFIP provision is not an "adopted" provision of the RSUI policy. Apparently realizing this, RSUI backed away from that argument in its post-submission brief, and asserted its second argument more strenuously. *See* RSUI's Resp. to Post–Submission Brief at ¶ 9.

With respect to the second argument, RSUI argues that while the RSUI policy does not itself "adopt" the NFIP provision, the NFIP provision must be used in calculating the amount of *covered* damages under the Westchester and Essex policies in order to determine if $30 million in covered damages have accumulated under those policies. *Id.* (emphasis in original). Said another way, RSUI argues "the total amount of covered flood damages must be calculated using the [NFIP provision] in order to determine the amount of erosion of the underlying limits." *Id.* at ¶ 10. In making its second argument, RSUI has simply reverted to an old argument which this Court has rejected many times before.

In an order signed on August 22, 2008[# 41], the Court granted summary judgment in favor of ARM, finding, *inter alia,* that pursuant to the terms of the RSUI policy, RSUI's liability has attached as a matter of law based on the underlying insurers' payment of their policy limits.

In October 2008, RSUI filed a motion for reconsideration of that order, which the Court denied on November 24, 2008, 2008 WL 5973224. *See* Order [# 82]. In the order denying RSUI's motion for reconsideration, the Court held:

> ... RSUI contends the policy gives it a right to make the substantive determination of whether ARM's losses under the underlying policies qualified as *covered* losses under those policies. RSUI argues there is a fact issue as to whether ARM's covered losses exceeded the underlying policies' combined $30 million limit. *Id.* Apparently, RSUI is under the impression the August 22nd Order agreed with these contentions and "ARM must prove it has a loss *covered* under the terms of the RSUI and Westchester policies that exceeds $30 million." *See* Mot. to Reconsider at ¶ 23 (emphasis in original).

RSUI is mistaken. In the August 22nd Order, the Court explicitly held:

> It is undisputed the underlying insurers have paid $30,000,000. Therefore, whether or not the underlying insurers failed to take advantage of exceptions in their coverage or otherwise overpaid, as RSUI claims, is not relevant to the issue of whether RSUI's liability has attached. The simple fact that both underlying insurers have paid their policy limits as defined in Item 6 of the excess insurance contract is sufficient to trigger RSUI's duties under this clause.

Order at 11. The Court could not have been more clear there is no fact issue remaining as to whether ARM's losses, which have already been paid for by the underlying policies, were "covered" by those policies. All that is required for attachment by the plain language of the RSUI policy is that the underlying insurers have "paid or have admitted liability for the full amount of their respective loss liability ..." Mot. Summ. J. at Ex. C, RSG 910020304. Because the underlying insurers paid the full amounts of their policies, RSUI's duties to ARM under the RSUI policy have therefore been triggered. This holding does not apply to losses arising under the RSUI policy—RSUI may of course litigate whether losses are "covered" by its policy, and will not be liable for ARM's damages not covered by the RSUI policy. The issue of attachment, already considered and decided in the August 22nd Order, is separate from the issue of RSUI's liability under the RSUI policy and which losses are specifically covered under that policy, which has not yet been considered by the Court.

*Id.* at 7–8. The Court could not have been more clear that RSUI does not have a right under its policy to make the substantive determination of whether ARM's losses under the underlying policies qualified as covered losses under those policies.

In arguing this point, RSUI makes much of the "Application for Recoveries" clause in the RSUI policy, which provides "the Insurers to this excess policy recognize that the [Westchester] policy limits can be eroded or exhausted, wholly or partially, by application of said sublimits." RSUI Mot. at Ex. 3, RSUI UWR 8. In its motion for summary judgment on this issue, RSUI blatantly changes the wording of this provision, arguing that the provision says "application of the underlying sublimits *must* be considered in determining whether the primary and underlying excess policies are eroded or exhausted." RSUI's Mot. Summ. J. at ¶ 7 (emphasis added). But that is not what the provision says—it merely allows that sublimits *may* be eroded or exhausted.

Therefore, the Court finds that the RSUI policy does not "adopt" the NFIP provision of the Westchester policy, and neither is RSUI allowed to use the provi-

sion in calculating the "covered" losses under the underlying policies. In short, the NFIP provision of the Westchester policy is simply irrelevant to coverage under the RSUI policy. RSUI's motion for summary judgment on NFIP coverage is DENIED.

### MOTION FOR SUMMARY JUDGMENT ON SETTLEMENT AGREEMENTS

In the interest of developing the record as fully and completely as possible, the Court GRANTS RSUI's motion for leave to file a motion for summary judgment [# 113], and addresses the merits of the motion herein.

## I. Background

It is undisputed ARM is the first "named insured" under the RSUI group policy, along with the property owners. ARM, however, does not itself own any of the properties in question. Instead, according to ARM, ARM acts as the agent of the property owners by agreement and has the exclusive right to adjust the claims in question. ARM Resp. [# 130] at 2. It is also undisputed the RSUI policy contains the following "anti-assignment" clause:

**F. Transfer of Your Rights and Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

RSUI's Mot. Summ. J. [# 113] at App. A.

RSUI contends in the present motion that ARM and the owners of seven of the nine apartment complexes at issue violated the RSUI policy's anti-assignment clause

by entering into six "Agreements in Settlement of Insurance Claims, Release and Assignment" (the "Insurance Claim Agreements"). RSUI claims the Insurance Claim Agreements fully release ARM from liability to the property owners for all present and future claims and waive any further right to damages, in return for a collective payment of approximately $16 million by ARM. The Insurance Claim Agreements also contain assignments of the owners' insurance claims to ARM, allegedly in violation of the anti-assignment provision of the RSUI policy. The agreements were signed between February and May of 2007, well after the properties sustained the relevant damage from Hurricane Katrina.

In the present motion, RSUI contends ARM has no right to coverage under the RSUI policy with regard to the seven insured properties for which there are Insurance Claim Agreements.[6] RSUI contends ARM violated the RSUI policy's anti-assignment provision by entering into the agreements with the properties' owners, and therefore ARM cannot recover from RSUI at all or, in the alternative, ARM's damages are capped at the amount it paid to the seven property owners.[7]

Secondly, with regard to the remaining two insured properties for which there are no Insurance Claim Agreements,[8] RSUI argues ARM cannot recover because it has no ownership and/or insurable interest in those properties, as there is no evidence that either of the two owners has given ARM any rights as an assignee of insurance claims or proceeds.

---

**6.** The 7 properties subject to the Agreements are generally known as Belmont, Seaside, Courtyard, Gulf Grove, Oak Park, Quietwater, and Royal Gulf.

**7.** ARM seeks to recover (in total) $26,456,240 from RSUI, whereas the seven property owners gave full releases in return for a collective

payment of $16,941,964 from ARM. Thus, RSUI argues ARM's damages for those 7 properties should be capped at $16,941,964.

**8.** The remaining 2 properties, for which there is no evidence of any Agreements, are Lexington and Longwood.

## II. Analysis

### (a) Applicability of the RSUI Policy's Anti-assignment Provision

The crux of the disagreement between ARM and RSUI springs from the fact that the assignments in question were made "post-loss"; that is, the damage to the properties happened in August 2005, and the Insurance Claim Agreements assigning the property owners' claims to ARM were executed in 2007. ARM's Resp. at 3.

ARM argues correctly that the law in the large majority of jurisdictions in the United States is that an anti-assignment clause does not apply to post-loss assignments. *See, e.g. Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir.2006) ("As a general matter, New York follows the majority rule that [an anti-assignment] provision is valid with respect to transfers that were made prior to, but not after, the insured-against loss has occurred."). The Court has no doubt that this is indeed the well-settled majority view, nor that the justifications behind it are wise.[9] Indeed, the justification for such a rule is obvious: once the insured-against loss has already occurred, the policy holder is simply transferring a cause of action, rather than a particular risk profile, so the danger of assignment would appear to be past; the insurer is still exposed only to the risk it originally evaluated. *See e.g., Globecon*, 434 F.3d at 171 (stating justification for the majority view); *Northern Ins. Co. of N.Y. v. Allied Mutual Ins. Co.*, 955 F.2d 1353, 1358 (9th Cir.1992) ("When the loss occurs before the transfer, the characteristics of the [assignee] are of little importance: regardless of any transfer, the insurer still covers only the risk it evaluated when it wrote the policy."); *Public Util. Dist. No. 1 v. Int'l Ins. Co.*, 124 Wash.2d 789, 881 P.2d 1020 (1994) (finding "[t]he purpose of a no assignment clause is to protect the insurer from increased liability. After events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity.").

However, in 2002, the Fifth Circuit explicitly considered a post-loss assignment where the insurance policy at issue contained an anti-assignment clause. In an unpublished opinion, the Fifth Circuit held "[t]he present state of the law in Texas and in this circuit (whatever may be the case elsewhere) is that no showing of prejudice is required to enforce the anti-assignment clause ... and that clause applies here to bar a post-loss assignment." *Ins. Co. of Pennsylvania v. Hutter*, 34 Fed.Appx. 963, 2002 WL 663778 (5th Cir. 2002). The court based its decision partly on *Conoco, Inc. v. Republic Ins. Co.*, a previous decision in which the Fifth Circuit (applying Texas law) held that even a post-loss assignment was barred by an anti-assignment provision in an insurance contract. 819 F.2d 120, 124 (5th Cir.1987). The Fifth Circuit implicitly considered the post- versus pre-loss distinction in *Conoco*, as it specifically alluded to the assignee's argument that the court should distinguish

---

9. *See* 3 Couch On Insurance § 35:7 (3d ed. 2008) (citations omitted):

[T]he great majority of courts adhere to the rule that general stipulations in policies prohibiting assignments thereof except with the consent of the insurer apply only to assignments before loss, and do not prevent an assignment after loss, for the obvious reason that the clause by its own terms ordinarily prohibits merely the assignment of the policy, as distinguished from a claim

arising thereunder, and the assignment before loss involves a transfer of a contractual relationship while the assignment after loss is the transfer of a right to a money claim. The purpose of a no assignment clause is to protect the insurer from increased liability, and after events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity."

between the assignment of an insurance "claim," which the no-assignment clause would prohibit, and the assignment of a mere right to "proceeds," such as arises after a loss has already occurred. *Id.* The Circuit was not swayed by the argument, and found "[w]ords cannot change a plugged nickel into a silver dollar"—the no assignment clause still operated to prohibit the assignment. *Id.* Thus, ARM's argument that the Fifth Circuit has never considered the dichotomy between pre- and post-loss assignments is incorrect.

Furthermore, ARM's argument that Texas law has changed on this subject since the Fifth Circuit considered it in *Hutter* is also incorrect. The Texas Court of Appeals case considered in *Hutter* was *Texas Farmers Ins. Co. v. Gerdes By and Through Griffin Chiropractic Clinic,* in which the court of appeals considered a post-loss assignment allegedly in contravention of a non-assignment clause that provided (identically to the one in the present case) "[y]our rights and duties under this policy may not be assigned without our written consent." 880 S.W.2d 215, 218 (Tex.App.-Forth Worth 1994). The court of appeals held "the non-assignment clause contained in the insurance contract effectively barred an assignment of rights," such that the ***post-loss*** assignment had no legal effect. *Id.* at 219. Texas law does not appear to have changed on this issue, as a more recent court of appeals case held similarly that where the insured had assigned its claims a year after the loss occurred and the policy had an anti-assignment clause, the assignee was not allowed to pursue the insurance claims. *See Dr. Michael Hoffman & Associates ex rel. Dallas Medical Holdings, Ltd. v. St. Paul Guardian Ins. Co.,* 2005 WL 1950848 (Tex. App.-Dallas August 16, 2005).

Finally, the one case cited by ARM in support of their position from this jurisdiction is *McLaren v. Imperial Cas. and Indem. Co.,* a federal district court case interpreting Texas law in which the court stated it "ha[d] no doubt that a Texas court would hold that the policy prohibition against assignment of an interest under the policy is inapplicable to the assignment of causes of action that have come into existence after the loss has occurred." 767 F.Supp. 1364 (N.D.Tex. February 12, 1991). This case was decided before *Hutter,* however, in which the Fifth Circuit gave its clear (and opposite) interpretation of Texas law. Thus, the Court finds under Texas and Fifth Circuit law the RSUI policy's anti-assignment provision applies to bar the post-loss assignment of claims.

### (b) Proof of Prejudice by RSUI

Although ARM argues that a showing of prejudice is required when an insurer urges forfeiture of an insurance policy due to breach, *see* ARM's Resp. at 10–11, the Court remains unconvinced. First, the Fifth Circuit's holding in *Hutter* explicitly rejected "the broad proposition that Texas courts ... will no longer apply the explicit terms of an insurance policy in the absence of showing prejudice." 2002 WL 663778 at *1. Secondly, to find in the present case that RSUI is not prejudiced—due to the fact that assignment of the property owners' insurance claims to ARM purportedly did not change RSUI's risk exposure under the policy—would be to effectively ignore clear Fifth Circuit precedent indicating that in this jurisdiction anti-assignment clauses may effectively bar both pre- and post-loss assignments. Such a finding of no prejudice would necessarily be based on the fact that the assignments in question were made post-loss, and therefore the "risk profiles" RSUI was insuring did not change. But the Court, regardless of the wisdom of this finding, cannot make it without determining that all post-loss assignments by an insured, even when in express contraven-

tion of an anti-assignment clause, do not prejudice the insurer—a proposition the Fifth Circuit has explicitly rejected. Therefore, the Court finds RSUI is not required to prove it was prejudiced as a result of the assignments.

### (c) Insurable Interest Requirement

ARM claims that even if the Court invalidates the assignments—as the Court has done—ARM can still pursue the claim because it was an insured under the RSUI policy and has an "insurable interest" in the properties. In other words, even if the assignment provision of the Insurance Claim Agreements is rendered invalid, the balance of the agreement remains enforceable, and ARM still retains the exclusive right to adjust and settle any claim under the RSUI policy. ARM's Resp. at 8. RSUI claims, however, that it is undisputed "ARM has no ownership or other financial interest" in any of the nine properties. RSUI's Mot. Summ. J. at 6. Thus, RSUI claims there is no evidence ARM has any insurable interest in the properties, and therefore cannot recover proceeds from ARM with respect to those properties. *Id.*

 Under Texas law, a party must have an insurable interest in the insured property to recover under an insurance policy, but it is not necessary that the party own the property to have an insurable interest. *Jones v. Texas Pacific Indem. Co.,* 853 S.W.2d 791, 794 (Tex.App.-Dallas 1993). "[A]n insurable interest exists when the [insured] derives pecuniary benefit or advantage by the preservation and continued existence of the property or would sustain pecuniary loss from its destruction." *Id.* (citing cases). However, "[i]f a claimant cannot suffer any pecuniary loss or derive any benefit from the property, he has no insurable interest." *Id.* Mere wager policies, that is, policies in which the insured party has no interest whatsoever in the matter insured, but only

an interest in its loss or destruction, are considered void as against public policy. *Kennedy v. Laird,* 503 S.W.2d 664 (Tex. Civ.App.-Houston [1st Dist.] 1973).

 RSUI correctly notes the claimant, ARM, has the burden of proving an insurable interest. *Jones,* 853 S.W.2d at 794 (citing *Monarch Fire Ins. Co. v. Redmon,* 109 S.W.2d 177, 178 (Tex.Civ. App.-Dallas 1937, no writ)). Furthermore, whether the parties had an insurable interest in the property is a question of law, not fact. *Id.* (citing *Smith v. Eagle Star Ins. Co.,* 370 S.W.2d 448, 450 (Tex.1963)). To prove it has an insurable interest, ARM puts forth the testimony of Dennison, who testifies that "ARM derives a pecuniary benefit by the preservation and continued existence of the Properties because ARM's compensation is driven by the properties and their continued coverage under the group policies that it purchases." *Id.* at ¶ 4. Thus, ARM argues it derives a pecuniary benefit or advantage from the preservation of the property because in the event a property has to be removed from a policy, ARM loses compensation. In other words, because ARM receives a fee for purchasing insurance for the property owners, it follows that ARM will lose its fees if the properties are damaged and thereby removed from the policy, and therefore ARM has a pecuniary interest in the preservation of the properties. But merely receiving a fee for purchasing insurance for the property owners—the only interest ARM has asserted—simply does not amount to an insurable interest in the property under Texas law, and ARM has cited no case which indicates the contrary. The Court finds that on the record before it ARM has not proven it has or has ever had an "insurable interest" in any of the properties in question.

### (d) Waiver of Insurable Interest Requirement

■ The Texas Supreme Court has also indicated, however, that a plaintiff may be able to recover from a defendant insurer by showing the defendant waived the "insurable interest" requirement, or should be estopped from asserting the plaintiff's lack of an insurable interest. *See, e.g., Republic Ins. Co. v. Silverton Elevators Inc.*, 493 S.W.2d 748 (Tex.1973). Such a situation may arise if a plaintiff was issued an insurance policy covering property in which it did not have an insurable interest, but the defendant accepted the plaintiff's premiums, although the defendant was sufficiently informed as to the plaintiff's circumstances that it should have known the plaintiff did not have an insurable interest. *Id.* ("Issuance of the policy and collection of the premiums with such knowledge operates as a waiver of any requirement that the named insured own or possess a beneficial interest in the insured property.").

Thus, although ARM does not have an insurable interest, RSUI may have waived such a defense by allowing ARM to be the primary insured on the policy since its inception and accepting the premiums paid by ARM. The previously-discussed Texas decision on this issue has clear parallels to the present case. *Republic Ins. Co.*, 493 S.W.2d at 748. In *Republic*, the insurer knew of the lack of an insurable interest at the time the policy was issued, and thus the Texas Supreme Court held that the insured was entitled to recover for a fire loss even though the goods were owned by another person, since the risk to the insurer was not enlarged beyond that contemplated by the policy. *Id.* Specifically, the court held that even though the named insured was not an owner of the destroyed goods and did not have an insurable interest in the goods, nevertheless the issuance of the policy and longstanding collection of

premiums by the insurer *with knowledge of the lack of any insurable interest* "operat[ed] as a waiver of any requirement that the named insured own or possess a beneficial interest in the insured property." *Id.* at 750 (citing earlier Texas cases in which the named insureds were not the owners or sole owners of the insured properties, but "the true owner was known to the insurance agent and was allowed direct recovery, or recovery for his benefit, on the grounds that the insurance company had waived … the lack of an insurable interest."). The court found there was no conflict between this holding and other cases that have held waiver and estoppel cannot operate "to add specifically excluded risks or to enlarge the benefits or risks therein set forth." *Id.* at 751. The court explained that in the instant case the plaintiffs sought to recover only on the risk assumed by the insurance company under the terms of the written policy (for which the insurance company had collected its premiums), and for destruction of precisely the same goods identified in the policy; in other words, there was no evidence the risk to the insurer was enlarged because the goods were owned by a person other than the plaintiff in the suit. *Id.*

■ RSUI claims that even under *Republic*, the doctrine of waiver or estoppel may apply only to allow the "true owners" of the property, who actually have an insurable interest, to recover. Def.'s Resp. at 4. ARM claims, however, it "seeks *solely* to recover from RSUI for the benefit of the remaining property owners." ARM's Surreply at 4, n. 9 (emphasis added). Thus, the Court finds that RSUI has waived the right to assert ARM's lack of an insurable interest in the properties in question as a matter of law, by accepting ARM's premiums, allowing ARM to be the "named insured" under the policy, and allowing ARM to prosecute this case as the

sole plaintiff without ever challenging ARM's standing to do so before the filing of the present motion, which was not filed until *January 13, 2009,* although the case was set for docket call on January 23,2009, with trial to take place in the first week of February, 2009.[10]

This case is similar to *Republic,* in that allowing ARM to recover on behalf of the property owners, despite ARM's lack of its own insurable interest, does not enlarge the coverage or benefits under the RSUI policy. Instead, ARM seeks to recover only on the risk assumed by RSUI under the terms of the written policy (for which RSUI has long collected premiums from ARM), and for destruction of precisely the same properties that have long been identified in the policy. In other words, there is no evidence the risk to RSUI is enlarged one iota because the properties are owned by persons or entities other than ARM, the plaintiff in this suit. Thus, because ARM retained the exclusive right to adjust and settle "[a]ll insurance claims and losses that may arise under any insurance policy under the program," it appears that ARM is still a proper plaintiff in this case and a proper representative of the property owners.

For the reasons set forth above, RSUI's motion for summary judgment on the issue of the Insurance Claim Agreements is GRANTED in part and DENIED in part. The Court finds the assignment provisions of the Insurance Claim Agreements between the property owners and ARM are in violation of the RSUI policy's anti-assignment clause, such that the assignment provisions of those agreements are rendered invalid. Furthermore, although the Court finds ARM does not technically have an insurable interest in the properties in question, the Court also finds RSUI has

waived this defense and ARM may properly recover for the benefit of the property owners on RSUI's written policy.

### CONCLUSION

In accordance with the foregoing,

IT IS ORDERED that ARM's unopposed motion for extension of time to file [# 71], ARM's unopposed motion to file sur-reply to RSUI's motions for summary judgment [# 90], RSUI's unopposed motion for leave to file a rebuttal to ARM's surreply [# 94], RSUI's unopposed motion for leave to file a supplement to its rebuttal of ARM's sur-reply [# 101], and ARM's unopposed motion for leave to file a supplemental response to RSUI's motion on flood exclusion [# 126] are GRANTED; but that RSUI's motion to strike ARM's response in opposition [# 146] is DENIED.

IT IS FURTHER ORDERED that Defendant RSUI's Motion for Partial Summary Judgment on Flood Exclusion [# 52] is DENIED.

IT IS FURTHER ORDERED that RSUI's Motion for Partial Summary Judgment on NFIP Coverage [# 54] is DENIED, but that RSUI's motion to strike evidence in support of ARM's response to the motion for summary judgment [# 89] is GRANTED.

IT IS FINALLY ORDERED that RSUI's Motion for Leave to File Defendant's Motion for Summary Judgement [# 113] is GRANTED, and RSUI's attached Motion for Summary Judgment [included in # 113] is GRANTED in part and DENIED in part, as set forth above.

---

**10.** Due to the multitude of filings with complex substantive issues to be decided which were made so near to the trial date, it was determined by the Court that the case was not ready for its trial setting in February, and was reset for trial in April of 2009.